THE STATE OF OHIO, APPELLEE, *v.* TERRY, APPELLANT.

(No. 27180—Decided February 10, 1966.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Rueben Payne,* for appellee.

*Mr. Louis Stokes,* for appellant.

SILBERT, C. J. This is an appeal on questions of law from a judgment and sentence imposed by the Court of Common Pleas of Cuyahoga County.

John W. Terry, the appellant herein, was indicted on a charge of carrying a concealed weapon, in violation of Section 2923.01, Revised Code. A pre-trial motion to suppress the evidence was denied, and, upon a plea of not guilty, the court, sitting without a jury, returned a verdict of guilty.

The relevant facts are as follows: At approximately 2:30 in the afternoon of October 31, 1963, a Cleveland detective with thirty-nine years of experience observed two persons, later identified as John W. Terry and Richard D. Chilton, engaged in behavior, on the corner of East 14th Street and Euclid Avenue (in downtown Cleveland), which immediately attracted his attention and aroused his suspicions. Positioning himself across the street he observed these men for approximately ten to twelve minutes as they alternately left the corner on which the other was stationed, walked several hundred feet up the Huron Road block, peered into the window of either a jewelry store or an airline office and then returned to the corner to converse with the other. In turn the other person would leave the corner, repeat these actions and return to the corner. This procedure was repeated at least two to five times by both men. During this period, a third man, later identified as Carl Katz, approached the corner, spoke briefly to the two men and then departed.

After ten to twelve minutes of this behavior, Terry and Chilton left the corner and proceeded west on Euclid Avenue several hundred feet to where they again met Katz. The three then engaged in a conversation. As the detective testified: "* * * I didn't like their actions on Huron Road, and I suspected them of casing a job, a stick-up * * *." With this belief in mind, the detective approached the three men, identified himself and asked for their names. Receiving only a mumbled

response, the detective turned the defendant around, quickly "patted down" the outside of his clothing, and, perceiving a hard object in the inner breast pocket of his topcoat, inserted his hand and removed a fully-loaded automatic. At this point, the detective ordered the three men into a store, told them to face the wall and yelled to a store clerk to "call the wagon." He then proceeded to "pat down" Chilton and, upon perceiving a hard object in the lefthand pocket of his topcoat, inserted his hand and removed a fully-loaded revolver. A similar "patting down" of Katz revealed nothing. The three men were then taken to the police station where Terry and Chilton were charged with carrying concealed weapons. Separate trials were ordered, and, after a motion to suppress was denied, the defendant Terry was convicted of a felony under Section 2923.-01, Revised Code.

In the defendant's brief, the following assignments of error are made:

1. The court erred in not sustaining defendant's motion to suppress upon making its finding that the arrest herein was illegal.

2. The court erred in refusing to apply constitutional guarantees prohibiting illegal searches and seizures and substituting therefor a doctrine of stop and frisk.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

That amendment prohibits an arrest without "probable cause," *Wong Sun* v. *United States* (1963), 371 U. S. 471, and is applied against the states through the Fourteenth Amendment. *Wolf* v. *Colorado* (1949), 338 U. S. 25.

However, the ambiguous nature of the word, "arrest," and the issue of the right of the police to stop a person in a public street and question him under circumstances that would reasonably call for investigation and inquiry, present complex legal questions in the factual context of this case. Consequently, the

initial question to be resolved is the authority of the detective in the circumstances shown here to stop and question the defendant. The validity of the subsequent police action and the determination of whether the detective had adequate "reasonable grounds" to make the arrest will hinge, in part, on the propriety of this initial inquiry.

The right of the proper authorities to stop and question persons in suspicious circumstances has its roots in early English practice where it was approved by the courts and the common-law commentators. See: 2 Hawkins, Pleas of the Crown (6th Ed. 1777) 122, 129; 2 Hale, Pleas of the Crown (Amer. Ed. 1847) 89, 96-97; *Lawrence* v. *Hedger* (Common Pleas 1810) 3 Taunt. 14, 128 Eng. Rep. 6. Today, in several states, the authority of police officers to detain suspects for a reasonable time for questioning is granted by statute. *E.g.*, New York Code of Criminal Procedure (L. 1964, Chapter 86, Section 180-a); General Laws of Rhode Island (1956), Section 12-7-1; New Hampshire Revised Statutes (1955), Chapter 594, Section 2; 11 Delaware Code (1953), Section 1902; Warner, "The Uniform Arrest Act," 28 Virginia Law Review (1942) 315; Massachusetts General Laws (1961), Chapter 41, Section 98. In others, the right is recognized by court decisions. *E.g.*, *People* v. *Rivera* (1964), 14 N. Y. 2d 441, 201 N. E. 2d 32; *Gisske* v. *Sanders* (1908), 9 Cal. App. 13, 98 P. 43; *People* v. *Martin* (1956), 46 Cal. 2d 106, 293 P. 2d 52; *People* v. *Jones* (1959), 176 Cal. App. 2d 265, 1 Cal Rep. 210; and *People* v. *Faginkrantz* (1961), 21 Ill. 2d 75, 171 N. E. 2d 5.

The United States Supreme Court, however, has never squarely decided whether the police may constitutionally stop and question a suspect without his consent in the absence of adequate grounds for arrest. However, the lower federal courts permit such field interrogations. See: *Henry* v. *United States* (1959), 361 U. S. 98, 106 (Clark, J., dissenting); *Brinegar* v. *United States* (1949), 338 U. S. 160, 178 (Burton, J., concurring); *Keiningham* v. *United States* (C. C. A., D. C., 1962), 307 F. 2d 632, certiorari denied (1963), 371 U. S. 948; *Busby* v. *United States* (C. C. A. 9, 1961), 296 F. 2d 328, certiorari denied (1962), 369 U. S. 876. The cases also indicate that an officer may stop and question even though he has insufficient grounds to make an arrest. See: *Ellis* v. *United States* (C. C. A., D. C.,

1959), 264 F. 2d 372, certiorari denied (1959), 359 U. S. 998; *United States* v. *Bonanno* (S. D. N. Y., 1960), 180 F. Supp. 71, 78, reversed on other grounds, *sub nomine, United States* v. *Bufalino* (C. C. A. 2, 1960), 285 F. 2d 408, cited with approval in *United States* v. *Vita* (C. C. A. 2, 1961), 294 F. 2d 524, 530.

Admittedly, there is some division of authority on the legality of the right to stop and question; however, the better view seems to be that the stopping and questioning of suspicious persons is not prohibited by the Constitution. See, Note, 50 Cornell Law Quarterly (1965), 529, 533; *United States* v. *Vita* (C. C. A. 2, 1961), 294 F. 2d 524, certiorari denied (1962), 369 U. S. 823. Of great persuasive authority do we consider the long line of California cases, decided under the rule of *People* v. *Cahan* (1955), 44 Cal. 2d 434, 282 P. 2d 905, in which this practice has been upheld. *E.g., People* v. *Martin* (1956), 46 Cal. 2d 106, 293 P. 2d 52; *People* v. *Simon* (1955), 45 Cal. 2d 645, 290 P. 2d 531; *People* v. *Jones* (1959), 176 Cal. App. 2d 265, 1 Cal. Rep. 210. Also, of great persuasive authority is the recent New York Court of Appeals decision in *People* v. *Rivera* (1964), 14 N. Y. 2d 441, 201 N. E. 2d 32, wherein this practice was also upheld. The courts of Ohio do not appear to have been squarely presented with this problem before. Therefore, we hold, in line with the great weight of authority, that a policeman may, under appropriate circumstances such as exist in this case, reasonably inquire of a person concerning his suspicious on-the-street behavior in the absence of reasonable grounds to arrest.

An individual who acts in a suspicious manner invites a preliminary inquiry by the proper authority. It does not unreasonably invade the individual's right to privacy to hold that the price of indulgence in suspicious behavior is a police inquiry. See, Traynor, "Mapp v. Ohio at Large in the Fifty States," Duke Law Journal (1962), 319. Such a minor interference with personal liberty would "touch the right of privacy only to serve it well." Traynor, *supra*, at page 334. If such questioning failed to reveal probable cause, it would thereby forestall invalid arrests of innocent persons on inadequate cause and the attendant invasion of personal liberty and reputation. If it revealed probable cause, it would do no more than open the way to a valid arrest. The business of the police is not only

to solve crimes after they occur, but to prevent them from taking place whenever it is legally possible. As stated by the New York Court of Appeals in the recent case of *People* v. *Rivera* (1964), 14 N. Y. 2d 441, at 444, 201 N. E. 2d 32:

"The authority of the police to stop defendant and question him in the circumstances is perfectly clear. * * * Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off."

Admittedly, this power to inquire may be abused. But the possibility of some future infraction should not require that the police should now be made powerless to make reasonable inquiries into suspicious behavior. If such abuses arise, we shall deal with them when the time comes. However, for the present, we hold that, under the facts of this case, the detective's inquiry was reasonable under the conditions presented.

The defendant contends, however, that in the instant case, despite a right of inquiry, the arrest took place the moment the defendant was questioned by the detective. According to his argument, since the arrest took place at the time of the initial inquiry, there was at that time no adequate "reasonable grounds" to arrest and, therefore, under the exclusionary rule of *Mapp* v. *Ohio* (1961), 367 U. S. 643, the evidence must be suppressed. In support of this, the defendant's brief states: "Since the police officers in this case did not conduct any interrogation of the defendant and his companions other than an inquiry of their names * * * his purpose was to arrest and not to interrogate."

A principal cause of the difficulty here is the ambiguous nature of the word, "arrest." Some courts have used the term, "arrest," to signify the mere act of stopping or restraining a person. But the term, "arrest," is more commonly used in the technical criminal-law sense as the seizure of an alleged offender to answer for a crime. Note, 39 New York University Law Review (1964), 1093, 1096; *Commonwealth* v. *Lehan* (1964), 347 Mass. 197. The cases decided by the United States Supreme Court appear to have adopted this latter usage. See: *Carroll*

v. *United States* (1925), 267 U. S. 132, 136; *Brinegar* v. *United States* (1949), 338 U. S. 160, 163; and it is the usage that has been adopted by the courts of Ohio. In 5 Ohio Jurisprudence 2d 19, Arrest, Section 3, ''arrest'' is defined as follows:

''An arrest, as the term is used in criminal law, signifies the apprehension or detention of the person of another in order that he may be forthcoming to answer an alleged or supposed crime. * * *''

Similarly, in *State* v. *Milam* (1959), 108 Ohio App. 254, 268, this court quoted with approval the following definition of arrest from *State, ex rel. Sadler,* v. *District Court*, 70 Mont. 378, 225 P. 1000:

''To constitute an 'arrest,' four requisites are involved: A purpose to take the person into custody of the law, under real or pretended authority and an actual or constructive seizure or detention of his person, so understood by the person arrested.''

It is readily apparent that a required element of an arrest is the *intent* of the officer to arrest. *United States* v. *Bonanno* (S. D. N. Y., 1960), 180 F. Supp. 71, at 81-83. In the instant case, when the detective approached the defendant, he had, as shown by uncontradicted testimony, no intention at all to arrest, but only to inquire as to the defendant's activities. As stated in the record:

''Q. You observed these men for some ten to twelve minutes? A. That's right.

''Q. You observed the mode of conduct that you have described to us? A. That's right.

''Q. Did you, sir, as a police officer consider that you should investigate it? A. I sure did.

''* * *

''Q. * * * after they left the corner and you observed them again in front of * * * [the store where the three men met] * * * what did you do? A. I stopped them and went over and talked to them.''

As to the exact time when the arrest took place, the record shows:

''Q. Then in this situation you considered them to be under arrest when you ordered the store people to call for the wagon? A. That's right.''

The defendant, however, contends that the case of *Henry v. United States* (1959), 361 U. S. 98, establishes the point that the arrest in the instant case took place the moment the defendant was stopped by the detective. However, in the *Henry case*, the government conceded in the lower courts, see (C. C. A. 7, 1958), 259 F. 2d 725, and adhered to the concession before the Supreme Court, that the "arrest" occurred the moment the car in which Henry was riding was stopped by the federal agents. The Supreme Court in its opinion stated:

"The prosecution conceded below, and adheres to that concession here, that the arrest took place when the federal agents stopped the car. This is our view of the facts of this particular case. * * *" 361 U. S. at 103.

When the opinion in *Henry* is read in light of this concession, it is apparent that the court was only deciding that, in the circumstances of that case, there was no probable cause to justify an "arrest" at the time the car in which Henry was riding was stopped. See: *United States* v. *Bonanno* (S. D. N. Y., 1960), 180 F. Supp. 71, at 85; *Busby* v. *United States* (C. C. A. 9, 1961), 296 F. 2d 328. Therefore, we hold that, in the instant case, the actual arrest did not occur until the defendant was ordered into the store after the loaded gun was discovered concealed on his person. Cf. *Rios* v. *United States* (1960), 364 U. S. 253.

Having determined that the police officer could validly inquire into the activities of the defendant, then it follows that the officer ought to be allowed to "frisk," under some circumstances at least, to insure that the suspect does not possess a dangerous weapon which would put the safety of the officer in peril. See, Remmington, "The Law Relating to 'On the Street' Detention, Questioning and Frisking of Suspected Persons and Police Arrest Privileges in General," 51 Journal of Criminal Law, Criminology and Police Science (1960), 386, 391. What is the officer to do in this situation? Are we to allow him the right of inquiry and then, when this right is exercised, reward him with an assailant's bullet? The practice of "frisking" is well accepted in police practice, and police officers seem unanimous in stating that "frisking" is done for self-protection and not as a mere evidentiary "fishing expedition." See: "Philadelphia Police Practice and The Law

of Arrest," 100 University of Pennsylvania Law Review (1952), 1182; Leagre, "The Fourth Amendment and the Law of Arrest," 54 Journal of Criminal Law, Criminology and Police Science (1963), 393. The Uniform Arrest Act and the state statutes which provide for questioning of suspicious persons specifically allow for the "frisking" of a suspect. See: Warner, "The Uniform Arrest Act," 28 Virginia Law Review (1942), 315; General Laws of Rhode Island (1956), Section 12-7-2; New Hampshire Revised Statutes (1955), Chapter 594, Section 3; 11 Delaware Code (1953), Section 1903; New York Code of Criminal Procedure (L. 1964), Chapter 86, Section 180-a. In other states the right is recognized by court decision. See: *People* v. *Rivera* (1964), 14 N. Y. 2d 441, 201 N. E. 2d 32; *People* v. *Martin* (1956), 46 Cal. 2d 106, 293 P. 2d 52; *People* v. *Simon* (1955), 45 Cal. 2d 645, 290 P. 2d 531; *People* v. *Jones* (1959), 176 Cal. App. 2d 265, 1 Cal. Rep. 210.

In the instant case, this officer of thirty-nine years experience reasonably suspected that the defendant was "casing" a store with robbery in mind. It was also logical for this experienced detective to presume that the defendant was armed and dangerous. As stated in the record:

"Q. Detective McFadden, can you tell us why you turned John Terry around facing the other two men, with you behind him? A. Due to my observation, the observation on Huron Road of these two men, I felt as though they were going to pull a stick-up and they may have a gun."

However, we must be careful to distinguish that the "frisk" authorized herein includes only a "frisk" for a dangerous weapon. It by no means authorizes a search for contraband, evidentiary material, or anything else in the absence of reasonable grounds to arrest. Such a search is controlled by the requirements of the Fourth Amendment, and probable cause is essential. *White* v. *United States* (C. C. A., D. C., 1959), 271 F. 2d 829. Therefore, we hold only that, on the facts presented in the instant case, the "frisk" for dangerous weapons was valid as an incident to a valid inquiry by the police. Each case must be decided upon its own facts.

As a result of the valid "frisk," a fully-loaded automatic was discovered concealed on the person of the defendant. The unauthorized possession of this weapon is a felony under Sec-

tion 2923.01, Revised Code. According to the uncontradicted evidence in this case, the defendant was not arrested until after he was ordered into the store. At the moment of the arrest, the detective had reasonable grounds to believe a felony was being committed. As stated in *Beck* v. *Ohio* (1964), 379 U. S. 89:

"* * * Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing the petitioner had committed or were committing an offense. * * *"

Therefore, we hold that, as the detective had validly found the gun, he had at the moment of the arrest adequate probable cause to arrest the defendant, *Busby* v. *United States* (C. C. A. 9, 1961), 296 F. 2d 328, and that the arrest in no way violated the Fourth Amendment.

One further point remains to be discussed concerning defendant's contention that the arrest occurred at the time of the initial questioning and, therefore, under the exclusionary rule of *Mapp* v. *Ohio* (1961), 367 U. S. 643, the evidence must be suppressed. Although we have held that the arrest in this case did not take place until the defendant was ordered into the store, we must note in passing that even if the arrest took place as defendant contends, it does not necessarily follow that this evidence must be suppressed.

The *Mapp* exclusionary rule was imposed upon the states not because of some command inherent in the Fourth Amendment, but rather because the Supreme Court believed that it was the only way the police could be forced to respect the Fourth Amendment. If the police could not obtain a conviction using evidence unlawfully obtained, they would have no incentive to conduct illegal searches. If we keep in mind this *raison d'etre* of the exclusionary rule, we can guard against confusion in the attendant rules that are developed. A judicial rule rendering evidence produced as the result of a "frisk" inadmissible would fail to deter the police from "frisking" suspects believed to be armed, as police "frisk" for their own protection rather than for the purpose of looking for evidence.

A rule of inadmissibility in such cases could only result in allowing the armed criminal to go free although failing to any meaningful extent to protect individual liberty. The exclusionary rule of illegally obtained evidence cannot be interpreted solely to provide a tidy "fox hunting" theory of criminal justice. The purpose of the exclusionary rule is to control police misconduct, and in this context it must be applied. Traynor, "Mapp v. Ohio at Large in the Fifty States," Duke Law Journal (1962), 319; Note, 50 Cornell Law Quarterly (1965), 529.

Furthermore, even if the Supreme Court would hold that federal officers may not inquire into suspicious street activities or "frisk" in the absence of probable cause to arrest, this does not necessarily invalidate the applicable state rules. There is no mandate in the *Mapp* opinion that the states henceforth must abide by all the interpretations of the federal courts. Traynor, "Mapp v. Ohio at Large in the Fifty States," Duke Law Journal (1962), 319, at 320. Local problems of law enforcement are quite different from federal problems, and the range of crimes encompassed by the states' jurisdiction creates more complicated patterns to be dealt with. The states are not precluded from developing "workable rules" governing arrest, searches and seizures to meet the practical demands of effective criminal investigation and law enforcement, provided those rules do not violate the constitutional proscriptions against unreasonable searches and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. *Ker* v. *California* (1963), 374 U. S. 23; *Beck* v. *Ohio* (1964), 379 U. S. 89. The necessities of law enforcement in large urban areas require the procedures utilized in the instant case. We agree with the District of Columbia Court of Appeals when it stated that it cannot believe that the "Supreme Court has forbidden the police to investigate crime." *Trilling* v. *United States* (C. C. A., D. C., 1958), 260 F. 2d 677, 700.

For the reasons stated herein, the judgment of the Common Pleas Court is affirmed.

*Judgment affirmed.*

ARTL and CORRIGAN, JJ., concur.