Joel J. Tyler, J.
What is involved in these obscenity proceedings is the argument that the complaints must be dismissed, in ■that, since there was no prior judicial scrutiny of the alleged offending films, the police officers had no legal basis to commence these actions, notwithstanding that none of the films were seized by them.[1]
Each of the complaints alleges a violation of section 235.05 of the Penal Law, in that, each of the 10 defendant corporations is said to have knowingly presented, in a public showing, an alleged obscene film.
Apparently, the procedure followed by the police, in each such case, involved their paid attendance at the theatre, taking notes of when, where and the detail of what they viewed, and then preparing an affidavit, which was sworn before a Judge of this court, whereupon a summons was issued to the officer by the Judge (under the purview of GPL 130.30 and 600.10, subd. 1) and duly served upon the corporate defendant. Simultaneously with the .service of the aforesaid summons, the officer duly served a subpoena duces tecum, requiring the production of the film on the return day of the summons to be used .in any requested preliminary hearing or trial. Of course, there were no warrants issued for the arrest of any individual, nor seizure of any film, and no individual was arrested or film seized..
Uniquely, defendants argue that, the mere service of the summons upon each of the corporations constituted a legal arrest, *355 and the arrest, like a seizure of film, was improper because there was absent a prior judicial scrutiny of the film to establish probable cause of obscenity and justification for the issuance of the summons.
The question posed, therefore, is whether or not the mere service of the .summons here involved constitutes an arrest in the legal sense. I do not hesitate to say and without equivocation, that the lay and common understanding would deny that such action constitutes an arrest. Further, the defendants’ position is unique and intriguing, .since it appears to be one of first impression in this State.
I can find no convincing support for defendants ’ unusual argument either in persuasive logic, statute, judicial precedent or even mythology.[2] To equate the service of a summons upon a corporation, which merely requires a court appearance at a later specified date for arraignment (CPL 1.20, subd. 27), with an arrest, runs counter to and defies our usual understanding of its meaning.
This problem was dealt with in Long v. Ansell (69 F. 2d 386, 388-389 [1934], affd. 293 U. S. 76), where the court noted: “ It has generally been held that an arrest is synonymous with the actual detention of the person or party arrested and does not *356 mean merely the service of a summons or citation * *, and as said in Hart v. Flynn’s Ex’r. 8 Dana (Ky.) 190, 191: ‘ Arrest signifies a restraint of the person, a restriction oí the right of locomotion, which cannot he implied in the mere notification or summons or petition or any other service of such process by which any bail is required, nor restraint of personal liberty.’ ”
Although the Long case involved the service of a summons in a civil action, its logic clearly applies to the service of a process in any case, both criminal and civil. Similarly, the mere service of a subpoena, requiring attendance before a legislative committee, is not an arrest, within the meaning of a statute exempting members of the Legislature therefrom, although disobedience to its command may give rise to an arrest. (People ex rel. Hastings v. Hofstadter, 258 N. Y. 425 [1932]; 6 C. J. S., Arrest, § 1, p. 571.)
Further, an analysis of the term “ arrest ” readily demonstrates its inapplicability to our situation. The word “ arrest ” is derived from the French word “ arreter,” meaning to stop or stay and signifies restraint of the person, depriving him of his own will and liberty. (People v. Mirbelle, 276 Ill. App. 533, 540 [1934]; Alter v. Paul, Sheriff, 101 Ohio App. 139, 141 [1955]; 5 C. J., Arrest, § 1, p. 385, n. 2[b].) Judge Kaufman reminds us that ‘ ‘ the Fourth Amendment may be construed as encompassing ‘ seizure ’ of an individual ”. (United States v. Bonanno, 180 F. Supp. 71, 78 [S. D. N. Y., I960].)
The term “ seizure ”, both in legal understanding and common parlance, connotes the taking of one physically or constructively into custody and detaining him, thus causing a deprivation of one’s “ freedom ” in a “ significant way.” (Miranda v. Arizona, 384 H. S. 436, 444 [1966].) It involves a real interruption of one’s liberty of movement, as a result of such detention. (Henry v. United States, 361 H. S. 98, 103 [1959]; Moran v. United States, 404 F. 2d 663, 666 [1968]; People v. Williams, 56 Misc 2d 837, 840 [1968]; Sobel, Search & Seizure, p. 64.)
Accordingly, there are essentially two elements to a technical arrest. The first .such element is that an accused “ individual ” ¡ — a human being — is involved as the subject of the action, and not the generic “person”, which under legal definition may include a corporation (Penal Law, § 10.00, subd. 7). Secondly, there must be present a “ seizure ” of such individual. As hereinabove defined, that term means essentially the subjugation to restraint or submission to custody of the accused individual. (Long v. Ansell, 69 F. 2d 386, supra; United States v. Bonanno, *357 supra; State v. Terry, 5 Ohio App. 2d 122, 127-128 [1966]; 39 N. Y. U. L. Rev. 1093, 1096.)
In this light, the term, arrest, would preclude its application to corporations. This position finds additional support in the view of my much respected former colleague, Judge William E. Ringel in People v. Eros Cinema Corp. (67 Misc 2d 618, 619 [1971]), when he noted: “ There is no authority for this contention, even if we assume, arguendo, that a corporation can be arrested * * * The definition of arrest and the acts constituting an arrest preclude any claim that a corporation can be arrested, (Henry v. United States, 361 U. S. 98).”
The defendants further contend that even absent an arrest or a seizure of the film, these criminal actions may not be commenced without a prior judicial scrutiny to establish probable cause of obscenity, and the mere determination by a police officer, alone, of what constitutes such probable cause, is impermissible in this sensitive area of law, involving First Amendment rights, and not only condemns an arrest or seizure as improper, but cannot even justify the issuance and service of a summons.
In support of their position, the defendants direct us to many cases, none of which are relevant here, since in all those cases there was either an arrest, in fact and in law, or a seizure of the film, without prior judicial scrutiny. For example, in one case cited, namely, Milky Way Prods. v. Leary (305 F. Supp. 288, 296 [1969], affd. sub nom. New York Feed Co. v. Leary, 397 U. S. 98), there was, in fact, an arrest preceded by a judicial examination and therefore, is not at all here applicable. Similarly, People v. Heller (29 N Y 2d 319 [1971], cert, granted 406 U. S. 916) and People v. Abronovitz (31 N Y 2d 160 [1972]), are not applicable. Heller stands for the proposition that an adversary hearing is unnecessary as a prerequisite for the issuance of an arrést and search warrant; and there was present there an arrest and a seizure. Abronovits held there was no prior judicial scrutiny with respect to two of the publications seised; and, therefore, the motion to suppress should have been granted.
Starting with Marcus v. Search Warrant (367 U. S. 717 [1961])/ the courts have condemned out-of-hand seizures by the police of any alleged obscene material. It was thus necessary to create the necessary judicial “ sensitive tools ” to separate the “ legitimate from illegitimate speech ” (Speiser v. Randall, 357 U. S. 513, 525 [1958]) and thereby sustain and protect our liberty of expression and prevent the suppression of constitu *358 tionally protected material. Such “ sensitive tools ” took the form of prior judicial examination of the alleged obscene material before the issuance of arrest or search warraMé.
However, where there have been no arrests or seizures, as here, there can be no suppression. (People v. Morgan, 68 Misc 2d 667, 669 [1971]; People v. Eros Cinema Corp., 67 Misc 2d 618, 620, supra) and even where there had been an illegal seizure, the courts have merely ordered the return of the material, but did not order the dismissal of the complaint (as defendants here petition) and thus immunize a defendant from further prosecution. (Tyrone, Inc. v. Wilkinson, 410 F. 2d 639 [1969], cert. den. 396 U. S. 985; Bethview Amusement Corp. v. Cahn, 416 F. 2d 410, 412 [1969]; Abrams & Parisi v. Canale, 309 F. Supp. 1360, 1363 [1969].)
There has been no actual or potential suppression of expression here. The alleged obscene film can continue to be shown, unfettered, until a final determination by trial. In no manner are the defendants prejudiced or damaged. The procedure followed here by the police was sensible and logical in the light of the cases and appears to have been contemplated as “ a reasonable balance between First Amendment guarantees and the obligation of Government to enforce its laws.” (People v. P. A. J. Theater Corp., 66 Misc 2d 373, 378 [1971], afifd. 70 Misc 2d 790 [App. Term, 1st Dept., 1972].) The police procedure here used seems to be suggested as a logical and safe compromise in P. A. J. Theater Corp. (supra) and the Federal eases there discussed.
Although not relevant to the prime issues here, it is of interest to note that the prosecution propounds the added argument that since each of the films represents hardcore pornography, the officers (specialized police units), having made that determination, are apparently authorized by judicial precedent, to either arrest for the offense committed in their presence (CPL 140.10) and also to seize the film, or to merely serve a summons, as was done here; and further, that no prior judicial examination is required in such cases.
There is respected authority to the effect that hard-core material is illegal by any standard; that its determination requires no expert or judicial analysis, since its ‘ ‘ indecency speaks for itself” and is “ patently offensive. ” (Memoirs v. Massachusetts, 383 U. S. 413, 457 [1966].) Such material is determinable as an objective appraisal, and is condemnable as if res ipsa loquitur. (Womack v. United States, 294 F. 2d 204, 206 [1961], cert. den. 365 TJ. S. 859; United States v. Klaw, 350 F. 2d 155, 167 *359 [1965]; United States v. Wild, 422 F. 2d 34, 36 [1969], cert, den. 402 U. S. 986; Hudson v. United States, 234 A. 2d 903, 906 [C. A., D. C., 1967]; People v. Kirkpatrick, 64 Misc 2d 1055, 1072, 1079-80 [1970], affd. 69 Misc 2d 212; People v. Morgan, 68 Misc 2d 667, 668, 670, supra.)
Mr. Justice Stewart readily finds it identifiable as material ‘ ‘ with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character ” and at times in exaggerated fashion. (Ginsburg v. United States, 383 U. S. 463, 499, n. 3 [1966].) However, it is not remarkable that others on the United States Supreme Court Bench would disagree and declare immensely difficult the identification of hard-core material, as did Mr. Chief Justice Warren in his comment — “ But who can define * hard core pornography ’ with any greater clarity than ‘ obscenity ’? ” (Jacobellis v. Ohio, 378 U. S. 184, 201 [1964].)
Apparently, my astute and learned colleague, Judge Harold J. Rothwax recalled that admonition when he observed, “ Initially, it must be said that what is ‘ hard core ’ pornography is not always clear and depends, in large degree, on one’s tastes, values and standards.” (People v. Avasino, 71 Misc 2d 889, 893 [1972]; see, also, People v. Rothenberg, 20 N Y 2d 35, 39 [1967].)
And so the struggle to delineate “ hard-core ” joins and continues unabated with that of “ obscenity,” in what Mr. Justice Harlan would aptly characterize as “utter bewilderment.” (Interstate Circuit v. Dallas, 390 U. S. 676, 704-705, 707 [1968].) We are, therefore, relegated to await (but with meagre expectation) the resolution of that struggle by our highest court.
Because of this divergence of judicial opinion as to the meaning of “hard-core ”, arrest or seizures in any obscenity case (either allegedly hard-core or otherwise) is not the best practice and should preclude such extreme action without prior judicial scrutiny and the issuance of an appropriate warrant.[3]
*360 Further, starting with Marcus v. Search, Warrant (367 U. S. 717, supra) and later in A Quantity of Books v. Kansas (378 U. S. 205 [1964]) and in this State, in People v. Heller (29 N Y 2d 319, supra) and People v. Abronovitz (31 N Y 2d 160, supra), arrests of individuals "and particularly seizures, both limited in scope and extensive, have, as aforesaid, been generally disapproved, without prior judicial examination,“because of the inherent danger of inhibiting the distribution or exhibition of constitutionally protected material. (Ringel, Search & Seizures, Arrests and Confessions [1972], p., 398; People v. Avasino, supra.)
In view of the- foregoing, the motion to dismiss is denied in each case.

. There are 25 separate actions, each against a named corporate defendant for the public showing of an allegedly obscene film. All defendants are represented by the same attorney.

. The Fifth Interim Report of the Temporary Commission on Revision of the Penal Law and Criminal Code (Feb. 1, 1966, p. 18), attempts to equate a summons as comparable to a warrant of arrest, in that they both compel the court appearance of a person against whom a formal charge has been filed. They distinguish an appearance ticket, however, from a summons as not creating the same degree of compulsion for court attendance and denominates the former as “a compassionate substitute for an arrest without a warrantThis argument (equating a summons with an arrest, but distinguishing both from an appearance ticket) appears strained to me. Both, a summons and an appearance ticket, command appearance in a court on a specific future date (CPL 1.20, subds. 26, 27; 130.10, 150.10) and disobeying either of them can lead to the issuance of an arrest warrant (CPL 130.50 and 150.60) and prosecution (Penal Law, § 215.50, subd. 3; § 215.58). The fact that a summons con-, templates an accusatory instrument already filed at the time of the issuance of the summons, while an appearance ticket contemplates one “to be filed,” does not appear to me, as it does to the commission, to represent a basis to say that the issuance and service of a summons is akin to the issuance and service of a warrant of arrest, while the issuance and service of an appearance ticket is a mere command to appear in court and connotes no arrest. The execution of a summons (and appearance ticket) is its mere delivery to the persons named and differs substantially in nature from a warrant of arrest, which is executed by taking actual physical custody and depriving one, then and there, of his liberty of movement (CPL 120.10). Although the purpose of a summons and arrest warrant is the same, namely, to compel the court appearance of a person against whom a formal charge has been filed, their modus opermdi and effect upon the person, in a legal and practical sense, are significantly dissimilar.

. We do not consider the form that such prior judicial scrutiny should take. Some maintain that a Judge, in all cases, must examine the very item(s) in question, prior to issuance of a warrant. (People v. Avasino, supra.) Others believe that in certain cases particularly as it involves books and other written material) sufficient judicial screening is presented by the mere careful examination of a specifically detailed and graphic affidavit of the officer seeking the warrant and the examination of the officer by the Judge ex parte, without requiring the scrutiny of the items involved, as the Federal Second Circuit Court approved in Overstock Book Co. v. Barry (305 F. Supp. 842 [1969], affd. 436 F. 2d 1289 [1970]).