[No. 40162-2-II.   Division Two.   December 20, 2011.]

THE STATE OF WASHINGTON, *Appellant*, v. EDUARDO
QUEZADAS-GOMEZ, *Respondent*.

*Anthony F. Golik*, *Prosecuting Attorney*, and *Anne M. Cruser*, *Deputy*, for appellant.

*James J. Sowder*, for respondent.

¶1 HUNT, J. — The State appeals the superior court's CrR 3.6 order suppressing evidence, which resulted in pretrial dismissal without prejudice of the charge against Eduardo

Quezadas-Gomez for possessing a controlled substance with intent to deliver. The State argues that (1) the officer's stop of Quezadas-Gomez's vehicle to obtain his name and address was lawful because the officer had probable cause to believe that Quezadas-Gomez had engaged in illegal delivery of controlled substances; (2) the trial court erred in ruling that the vehicle stop was "pretextual," which the trial court also ruled rendered illegal the officer's use of Quezadas-Gomez's name and address to obtain the search warrant; and (3) thus, the trial court erred in suppressing the evidence seized during execution of the search warrant. Quezadas-Gomez does not dispute that the officer had probable cause to arrest him at the time of the controlled buys; instead, he focuses on arguing that the probable cause authorized only an arrest, which the officer did not make, and that the stop was an unlawful pretextual stop, which justified the trial court's suppression of the evidence.

¶2 We hold that (1) the stop was not pretextual; (2) the officer had probable cause to arrest Quezadas-Gomez for the controlled buys he had witnessed and, therefore, could stop the vehicle to speak with Quezadas-Gomez; and (3) the officer thus lawfully obtained Quezadas-Gomez's true name and address. Accordingly, we reverse the trial court's suppression of evidence, and we remand for trial.

FACTS

I. POSSESSION WITH INTENT TO DELIVER

A. Controlled "Buys"; Probable Cause To Arrest

¶3 From July 22 to July 25, 2009, a confidential informant (CI) working with Vancouver Police Officer Ryan Demmon conducted several controlled drug buy operations. The CI telephoned a man known as "El Gordo," set up drug "buys" at specified locations, contacted "El Gordo" at these locations, purchased cocaine from "El Gordo" using prere-

corded money from the police, and turned the cocaine over to Demmon.[1] Clerk's Papers (CP) at 17.

¶4 The CI had previously described "El Gordo" to Demmon as a "Hispanic male, about thirty years old, about 6'00["] tall and about 250 pounds in weight." CP at 17. During the controlled buys, Demmon watched the CI enter the prearranged locations and observed a man fitting "El Gordo's" description arrive in a silver Nissan Sentra with Oregon plates numbered 902DQU and enter the premises where the CI's drug transactions took place. CP at 17. After the CI returned, Demmon asked the CI to describe "El Gordo," and the CI described the man Demmon had seen arrive in the silver Nissan Sentra. CP at 17.

## B. Investigatory Stop

¶5 Nine days later, on August 4, Demmon was on "uniformed patrol" when he "observed the subject described as El Gordo driving the same Nissan [sic] Sentra" and stopped the car "for the purpose of identifying [the driver] as a suspect in [the drug] investigation."[2] CP at 18. The driver identified himself as Eduardo Quezadas-Gomez and stated his address as 3412 Northeast 66th Avenue, number C29, Vancouver, Washington, and then drove away.[3]

## C. Search Warrant

¶6 Demmon and other officers conducted additional controlled drug buy operations, using Quezadas-Gomez's address to observe Quezadas-Gomez going from his residence to the specified controlled "buy" location on at least one occa-

---

[1] The CI had informed Demmon that "El Gordo" was known to distribute drugs at specific local restaurants, that he had sold drugs to others known to the CI, and that "El Gordo" had previously sold drugs to the CI. Clerk's Papers at 17.

[2] Demmon observed no traffic violations, did not stop the Nissan Sentra for such purpose, and issued no traffic citation.

[3] Demmon did not pat down Quezadas-Gomez, search his person, search his car, or find and seize any contraband.

sion. CP at 18. Demmon incorporated Quezadas-Gomez's name and address and other information he had obtained during the earlier controlled buys and the poststop surveillance of Quezadas-Gomez's residence to draft an affidavit for a warrant authorizing the search of Quezadas-Gomez's person, his residence, and two cars. Executing the search warrant, the officers found drugs and a variety of materials suggesting drug sale activities.

## II. PROCEDURE

¶7 The State charged Quezadas-Gomez with unlawful possession of a controlled substance with intent to deliver, with a school-bus-route-stop sentencing enhancement. Quezadas-Gomez moved to suppress the evidence the police had seized with the search warrant, arguing that the vehicle stop that led to his identification was an unlawful pretextual stop under *Ladson*[4] and, therefore, any evidence flowing from the "pretextual-stop" discovery of his identity and address was unlawful. The State responded that the vehicle stop was not pretextual but, rather, an investigatory stop, supported by "reasonable suspicion (if not probable cause)." CP at 34.

¶8 At the CrR 3.6 hearing, Demmon testified that he had authored the search warrant affidavit and that he had obtained utility records for Quezadas-Gomez's residence. The trial court reviewed the search warrant, the search warrant affidavit, and the search warrant return. The trial court determined that the identification information Demmon had obtained during the vehicle stop was critical to the subsequent surveillance of Quezadas-Gomez and the probable cause recited in the search warrant affidavit. The trial court orally ruled:

> *While there was probable cause and there was a belief in previous criminal activity having been committed,* the stop

---

[4] *State v. Ladson*, 138 Wn.2d 343, 979 P.2d 833 (1999).

itself was of an investigatory nature that was not related to any then occurring allegations of criminal violations. If the appellate courts wish to establish an exception to the [pretextual] stop area of law, I think that would be up to them to provide that. It's my duty to follow the law as I interpret it and I'm not aware of an exception to the [pretextual] stop.

If he had been arrested, he would have had certain rights in connection with that, such as *Miranda*[5] warnings, right to an attorney and so on that would have taken place, which did not occur as a result of this. So there is some reason to think that when the occurring—the then occurring circumstances of a [*Terry*[6]] stop are non-existent that—that a [pretextual] stop is not appropriate.

Report of Proceedings at 26 (emphasis added).

¶9 In finding of fact 4 of its written findings of fact and conclusions of law, the trial court stated:

The warrant makes reference to having controlled buys from the defendant on July 22nd through July 25, 2009 . . . . Without any subsequent contact between law enforcement and the defendant, the warrant reports that on August 4, 2009, Officer Demmon observed the subject he recognized as delivering cocaine during the previous controlled buy. Officer Demmon recognized the vehicle as the same car used in the controlled buy. The officer was on uniformed patrol at the time and conducted a traffic stop for the purpose of identifying him as a suspect of his investigation. By this method, the officer's [sic] learned the defendant's address and name. The sole purpose of the stop was to identify the suspect. No citation for a traffic infraction was issued. There is no information defendant was in possession of contraband or had contraband at that time or was committing a crime at that time.

CP at 61.

¶10 In conclusion of law 2, the trial court stated:

Officer Demmon stopped the defendant for the sole purpose of obtaining his identification and residence, this was a pretext

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

stop. A traffic infraction had not been committed. The most recent information they had concerning alleged controlled substance activities dealing with a confidential informant was on the 25th, some 9 days earlier. There was no reason to believe that defendant at the time of the stop was committing a crime or had evidence of a crime to fit within the exception of the search warrant requirement authorized by *Terry v. Ohio*, 5 Ohio App.2d 122, 214 N.E.2d 114 (1966)[7] [sic], or in *State v. Markham*, 40 Wn. App. 75 (April 2009)[8] [sic]. Because the controlled buy occurred nine days earlier there is no reason to believe the suspect is currently committing or recently committing an illegal act where evidence would be found on his person or in the car. Information gained through the illegal conduct, defendant's identification and his address, serve as a basis for subsequent investigation and cannot be excised from the search warrant and still have probable cause for issuance of a search warrant.

As a result, all evidence seized with the search warrant is suppressed.

CP at 62.

¶11 After the trial court suppressed the evidence, it granted the State's motion for dismissal of the charge against Quezadas-Gomez without prejudice. The State appeals the trial court's suppression of evidence.

## ANALYSIS

¶12 The State argues that the trial court erred when it concluded that the vehicle stop was an unlawful pretextual stop under *Ladson*, 138 Wn.2d at 349-51, because (1) Demmon had probable cause to arrest Quezadas-Gomez at the time of the stop (based on Quezadas-Gomez's participa-

---

[7] The trial court likely intended to cite *Terry*, 392 U.S. at 1, rather than *State v. Terry*, 5 Ohio App. 2d 122, 214 N.E.2d 114 (1966), *aff'd*, 392 U.S. 1 (1968).

[8] The trial court likely intended to cite *State v. Marcum*, 149 Wn. App. 894, 205 P.3d 969 (2009), a case that discusses *Terry* stops, rather than *State v. Markham*, 40 Wn. App. 75, 697 P.2d 263, *review denied*, 104 Wn.2d 1003 (1985), which did not involve these issues.

tion in the prior controlled drug sales and reasonable suspicion that Quezadas-Gomez's involvement in illegal drug sales was ongoing) and (2) the stop was a lawful investigative detention under *Terry*, 392 U.S. 1.[9] We agree.

## I. STANDARD OF REVIEW

■ ¶13 We review a trial court's ruling on a motion to suppress evidence to determine (1) whether substantial evidence supports the trial court's factual findings, and (2) whether the factual findings support the trial court's conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *Garvin*, 166 Wn.2d at 249 (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). We consider any unchallenged findings of fact as verities on appeal. *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009) (citing *State v. Gaines*, 154 Wn.2d 711, 716, 116 P.3d 993 (2005)). And we review the trial court's conclusions of law de novo. *Garvin*, 166 Wn.2d at 249.

## II. NOT A PRETEXTUAL TRAFFIC STOP

■ ¶14 We first address whether the trial court properly determined that Demmon's stop of Quezadas-Gomez's car was pretextual under *Ladson*. A traffic stop is pretextual when an officer stops a vehicle, under the guise of enforcing the traffic code, to conduct an investigation unrelated to driving. *Ladson*, 138 Wn.2d at 349-51. Pretextual stops "generally take the form of police stopping a driver for a minor traffic offense to investigate more serious violations—violations for which the officer does not have prob-

---

[9] Unlike the dissent, because we hold that Demmon had probable cause to arrest Quezadas-Gomez when he (Demmon) stopped the car, (1) we do not also address whether this investigatory stop was independently lawful under *Terry*; and (2) we need not address *United States v. Hensley*, 469 U.S. 221, 223, 227, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985), on which the dissent relies in part.

able cause." *State v. Myers*, 117 Wn. App. 93, 94-95, 69 P.3d 367 (2003), *review denied*, 150 Wn.2d 1027 (2004). Such stops violate article I, section 7 of the Washington State Constitution because "they are seizures absent the 'authority of law' which a warrant would bring." *Ladson*, 138 Wn.2d at 358 (quoting WASH. CONST. art. I, § 7). Although the police may enforce the traffic code, "[t]hey may not . . . use that authority as a pretext or justification to avoid the warrant requirement for an unrelated criminal investigation." *Ladson*, 138 Wn.2d at 357.

¶15  To determine whether a stop is pretextual, courts consider the totality of the circumstances, including the officer's subjective intent and the objective reasonableness of the officer's conduct. *Ladson*, 138 Wn.2d at 358-59. Generally, if the trial court finds that the stop was pretextual, all subsequently obtained evidence from the stop must be suppressed. *Ladson*, 138 Wn.2d at 359. The trial court correctly noted *Ladson*'s rationale:

> We begin our analysis by acknowledging the essence of this, and every, pretextual traffic stop is that the police are pulling over a citizen, not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving. Therefore the reasonable articulable suspicion that a traffic infraction has occurred which justifies an exception to the warrant requirement for an ordinary traffic stop does not justify a stop for criminal investigation.

138 Wn.2d at 349. We disagree, however, with the trial court's application of this rationale to the facts here.

¶16  Demmon's search warrant affidavit established that his sole intent in stopping Quezadas-Gomez was to investigate the drug sales in which he had observed Quezadas-Gomez participating and for which he needed Quezadas-Gomez's name and address. Demmon never purported to use any traffic code violation as a pretext for the stop. Neither *Ladson* nor any other Washington case that the parties cite, or of which we are aware, address the

apparently unique circumstances here:[10] where law enforcement acquires probable cause *before* an investigative stop, conducts the investigative stop for the sole purpose of obtaining identifying information to be used to further the investigation, and then releases the suspect and continues the investigation. Thus, this case presents an issue of first impression.[11]

¶17 As we have already explained, Demmon had probable cause to arrest Quezadas-Gomez for delivering cocaine to the CI. But, despite having probable cause to arrest Quezadas-Gomes, whom Demmon knew only by the nickname "El Gordo," Demmon decided to stop him only to obtain his true name and address so that Demmon could conduct surveillance on "El Gordo"/Quezadas-Gomez's residence and eventually obtain a warrant to search his house. In our view, because the greater intrusion of an arrest was legally justified, then this lesser intrusion of a mere stop to

---

[10] *See, e.g., Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004) (Nevada "stop and identify statute" requiring individuals to identify themselves to officers during investigative stops does not violate Fourth Amendment when initial stop is based on reasonable suspicion; addressing statute in the context of a contact occurring immediately following a report of a possible assault); *Hensley*, 469 U.S. at 223-24 (officers stop a vehicle *and detain* the people in the vehicle to facilitate investigation of offense that occurred approximately a week earlier in a neighboring county); *State v. Kennedy*, 107 Wn.2d 1, 726 P.2d 445 (1986) (reasonable suspicion justified stop as defendant left known drug house, where confidential informant had advised officers that defendant went to the house only to buy drugs); *Marcum*, 149 Wn. App. at 899-909 (stop, investigative detention, and arrest were lawful when officers stopped defendant leaving his home to deliver marijuana to a confidential informant); *State v. Serrano*, 14 Wn. App. 462, 544 P.2d 101 (1975) (stop and temporary detention appropriate based on officer's suspicion at the time of the stop that car could have been tampered with or stolen).

[11] Thus, the dissent correctly asserts that we "cite[ ] no case law establishing that police have the authority, once probable cause is established, to stop and detain a suspect solely to expand the non-traffic-related investigation." Dissent at 605. Accordingly, our holding here is new: Probable cause for the greater intrusion of an arrest encompasses legal justification for the lesser intrusion of a mere stop; and, therefore, no independent *Terry* analysis is necessary.

ask for name and address[12] was also legally justified; and we so hold.

¶18 This stop, therefore, did not meet the *Ladson* criteria for suppressing the evidence eventually obtained with the search warrant. The stop was not based on a traffic code violation pretext.[13] And collecting Quezadas-Gomez's name and address to advance an ongoing criminal investigation did not negate the officer's probable cause to intrude lawfully on Quezadas-Gomez's privacy, whether to effect a full-scale arrest or to effect some lesser intrusion, such as briefly speaking with Quezadas-Gomez and allowing him to drive away.

¶19 Even by Demmon's own testimony, the record is clear that he did not stop Quezadas-Gomez's car to enforce the traffic code; nor does the record suggest in any way that Demmon used the traffic code as a pretext for the stop. On the contrary, Demmon expressly stated that he stopped the car only to obtain the true name and address of the driver, whom he recognized as "El Gordo," the drug dealer in the CI's controlled "buys." And, as we have already noted, the record shows that Demmon had probable cause to arrest Quezadas-Gomez at the time of this stop.[14] Thus, the record does not support the trial court's conclusion that the stop was a pretextual traffic stop.

---

[12] Although the dissent asserts that "the degree of intrusion Officer Demmon used to identify Quezadas-Gomez and Quezadas-Gomez's address was significant," it does not dispute our assertion that the degree of intrusion would have been vastly more significant had Demmon arrested Quezadas-Gomez and taken him to jail. Dissent at 607.

[13] Because this stop was not based on any alleged traffic code violation, we respectfully disagree with the dissent's pretextual stop analysis.

[14] Because Demmon had preexisting probable cause to arrest Quezadas-Gomez, we respectfully disagree with the dissent's conclusion that the State also had to establish that Demmon suspected that Quezadas-Gomez was engaged in or about to be engaged in criminal activity when the stop occurred, particularly here, where the intrusion on Quezadas-Gomez's liberty was brief and minimal in comparison with the far more pervasive restraint on liberty that an arrest would have entailed.

¶20 We hold, therefore, that (1) because Demmon had probable cause to arrest "El Gordo," the lesser intrusion of this investigatory stop to obtain Quezadas-Gomez's true name and address was lawful; and (2) the evidence was subsequently lawfully seized under the search. Accordingly, we reverse the trial court's suppression of the evidence and remand for trial.

PENOYAR, C.J., concurs.

¶21 JOHANSON, J. (dissenting) — Quezadas-Gomez argues that the stop that led to his identification was an unlawful pretextual stop under *Ladson*[15] and that any evidence flowing from the discovery of his identity and address was therefore unlawful. I agree with Quezadas-Gomez and the trial court. For this reason, I respectfully dissent.

## ANALYSIS

### I. PRETEXTUAL STOP

¶22 In my view, the record supports the trial court's conclusion that this was a pretextual stop. Officer Demmon's search warrant affidavit established that he had no intention of enforcing traffic laws when he stopped Quezadas-Gomez. Officer Demmon's subjective intent was to investigate other possible offenses—the very evil *Ladson* was intended to address. *Ladson*, 138 Wn.2d at 349 ("We begin our analysis by acknowledging the essence of this, and every, pretextual traffic stop is that the police are pulling over a citizen, not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving. Therefore the reasonable articulable suspicion that a traffic infraction has occurred which justifies an exception to the warrant requirement for an ordinary traffic stop does

---

[15] *State v. Ladson*, 138 Wn.2d 343, 979 P.2d 833 (1999).

not justify a stop for criminal investigation."). Nothing in the record demonstrates that Officer Demmon had *any* objective justification for stopping Quezadas-Gomez at the time of the stop.

¶23 The majority justifies the stop by relying entirely on the preexisting probable cause to arrest for the drug offense. But it cites no case law establishing that police have the authority, once probable cause is established, to stop and detain a suspect solely to expand the non-traffic-related investigation. Neither party cites any case in which "law enforcement acquires probable cause *before* an investigative stop, conducts the investigative stop for the sole purpose of obtaining identifying information to be used to further the investigation, and then releases the suspect and continues the investigation." Majority at 602. It is the State's burden to establish that the stop was lawful and they have failed to do so. Accordingly, the trial court did not err in concluding that this was a pretextual stop, suppressing the evidence and dismissing the case.

## II. UNREASONABLE INVESTIGATORY STOP

¶24 Although the majority holds that the stop was lawful because the earlier controlled buy drug operations gave Officer Demmon probable cause to arrest Quezadas-Gomez, I disagree.

¶25 "A seizure is reasonable if the state can point to 'specific and articulable facts giving rise to a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity.'" *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997) (quoting *State v. Gleason*, 70 Wn. App. 13, 17, 851 P.2d 731 (1993) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), *overruled in part on other grounds by State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994), and citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State v. Garcia*, 125 Wn.2d 239, 242, 883 P.2d 1369 (1994)). A valid *Terry* stop must (1) be "'justified at its inception,'" and

(2) be " 'reasonably related in scope to the circumstances [that] justified the interference in the first place.' " *Ladson*, 138 Wn.2d at 350 (quoting *Terry*, 392 U.S. at 20). When evaluating a *Terry* stop, we consider the totality of the circumstances, including the purpose of the initial contact, the amount of physical intrusion upon the person's liberty, the officer's training and experience, and the length of the detention. The dispositive factors here are the purpose of the initial intrusion and the amount of physical intrusion on Quezadas-Gomez's liberty.

¶26 The record shows that Quezadas-Gomez delivered drugs only after he was contacted by a confidential informant (CI) and that Quezadas-Gomez had a reputation for selling drugs. The record contains no facts suggesting that *at the time of the stop*, Officer Demmon had any reason beyond mere conjecture to believe Quezadas-Gomez was committing a crime and such generalized suspicion alone is not sufficient to justify the stop. *See State v. Bliss*, 153 Wn. App. 197, 204, 222 P.3d 107 (2009) ("To justify a *Terry* stop under the state and federal constitutions, there must be some suspicion of a particular crime connected to this particular person, rather than a mere generalized suspicion that the person detained may have been up to no good."). Furthermore, Officer Demmon's own statements in the search warrant affidavit established that the sole reason he stopped Quezadas-Gomez was to identify him and to obtain an address; Officer Demmon never suggested that at the time of the stop he had any suspicion that Quezadas-Gomez was in the process of committing or about to commit a crime.

¶27 The record shows that the purpose of the initial intrusion was solely to gather additional information (Quezadas-Gomez's name and address) that might tie the previous drug activity to a specific location, broaden the scope of any potential search warrant, and benefit an ongoing drug investigation. Because there was no justification for the stop apart from furthering Officer Demmon's ongoing

drug investigation not related to the traffic stop, the stop was not justified at its inception.

¶28 Furthermore, the degree of intrusion Officer Demmon used to identify Quezadas-Gomez and Quezadas-Gomez's address was significant. Rather than conduct surveillance or use other investigative techniques that would not have touched on Quezadas-Gomez's liberty, Officer Demmon chose to seize Quezadas-Gomez and question him directly—a form of investigation that clearly intruded on Quezadas-Gomez's liberty. Additionally, although there is case law establishing that officers may request identification during a *Terry* stop, *see State v. White*, 97 Wn.2d 92, 640 P.2d 1061 (1982), *overruled on other grounds by State v. Brockob*, 159 Wn.2d 311, 150 P.3d 59 (2006), and *State v. Potter*, 156 Wn.2d 835, 132 P.3d 1089 (2006), the State has not directed us to any authority showing that determining a suspect's identity can justify a random investigatory seizure.

¶29 I find *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985), instructive in this context. Although *Hensley*, which the Supreme Court decided exclusively under the Fourth Amendment, establishes that *Terry* stops of individuals suspected of completed offenses are permissible under certain limited circumstances, in my view, the circumstances here do not support such a stop.

¶30 The *Hensley* Court addressed whether police officers can stop and detain individuals based on " 'wanted flyer[s]' " issued following a completed crime and held that officers may stop and detain a person in order to investigate a completed crime under some circumstances. *Hensley*, 469 U.S. at 226. The Court acknowledged, however, that "[t]he precise limits on investigatory stops to investigate past criminal activity are more difficult to define." *Hensley*, 469 U.S. at 228. To discern these limits, the Court applied the traditional test, balancing "the nature and quality of the intrusion on personal security against the importance of the

governmental interests alleged to justify the intrusion." *Hensley*, 469 U.S. at 228.

¶31 The Court noted, however, that governmental interests may be significantly less compelling when the investigatory stop relates to a completed crime because (1) such stops do "not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity," (2) it is less likely that exigent circumstances will exist, (3) "[p]ublic safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law," and (4) officers investigating past crimes "may have a wider range of opportunity to choose the time and circumstances of the stop." *Hensley*, 469 U.S. at 228-29. But the Court held that such stops are permissible when, as was the case in *Hensley*, "police have been unable to locate a person suspected of involvement in a past crime" because "the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice," in large part because of the risk of flight and the need to detain the suspect as quickly as possible. *Hensley*, 469 U.S. at 229. But the Court declined to address "whether *Terry* stops to investigate all past crimes, however serious, are permitted," and it never discussed stops that were intended purely to gather intelligence in ongoing investigations. *Hensley*, 469 U.S. at 229.

¶32 Even assuming, but not deciding, that article I, section 7 of our state constitution does not offer additional protection in the current context, the circumstances here are distinct from the narrow circumstances that existed in *Hensley*. Unlike the officer in *Hensley*, Officer Demmon did not detain Quezadas-Gomez because no one had been able to locate Quezadas-Gomez or to confirm or dispel Quezadas-Gomez's identity, nor does the record show that Officer Demmon intended to further detain Quezadas-

Gomez once he (Officer Demmon) identified him or that this was the only method of identifying Quezadas-Gomez. The previous drug buy operations demonstrated that the CI was able to contact Quezadas-Gomez and that Quezadas-Gomez was willing to engage in face-to-face contact with the CI upon the CI's request, thus there was little risk that the ongoing drug investigation or Officer Demmon's ability to find and arrest Quezadas-Gomez would have been compromised had Officer Demmon not stopped Quezadas-Gomez. Additionally, the record suggests that Quezadas-Gomez was known to frequent local restaurants and could easily have been found and identified without risk to the CI's identity. Also, as evidenced by Officer Demmon's lack of intent to arrest or otherwise detain Quezadas-Gomez at the time of the stop (despite the majority's assertion that Demmon had probable cause to do so), the stop was not intended to prevent additional criminal activity but, rather, to broaden the scope of Officer Demmon's investigation. Not only do these facts distinguish this case from *Hensley*, but they weigh *against* allowing such investigatory stops under the test in *Hensley*.

¶33 Accordingly, the State has not shown that the trial court erred when it granted Quezadas-Gomez's suppression motion and dismissed the case. I would affirm.

Review denied at 173 Wn.2d 1034 (2012).