IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34233-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BISIR BILAL MUHAMMAD, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Appellant Bisir Muhammad challenges the validity of the stop of his car, the search of his car, and the gathering of other evidence. He also challenges his convictions for first degree murder and first degree rape on the basis of double jeopardy and merger. We reject Muhammad's challenges and affirm his convictions.

FACTS

This appeal lies from the callous murder of Ina Clare Richardson, a petite 102-pound, 69-year-old woman. A jury convicted Bisir Muhammad of the homicide. Because issues on appeal concern a motion to suppress evidence and trial evidence, we alternate between facts presented at the suppression hearing and the trial.

We begin with some trial testimony. Victim Ina Richardson suffered from bipolar disorder. During her manic phases, Richardson openly trusted others. On the night or

morning of November 6-7, 2014, someone beat, raped, and strangled Richardson to death.

On November 7, a couple on a morning walk discovered Ina Richardson's naked corpse discarded along the side of an access road to a park in Clarkston. The unidentified Richardson bore bruises, scrapes, and cuts throughout her body and swollen lips. Her body bore defensive wounds indicating Richardson had struggled with her attacker. One of Richardson's pinkie nails was torn off. Richardson bled from her vagina and carried bruises on her thighs and genitalia. Since Richardson's feet remained remarkably clean, law enforcement officers suspected her killer slayed her elsewhere and transported the corpus to the dump site.

After the media broadcasted a description of the unidentified body, Ina Richardson's friend, Jeff Smith, told law enforcement that he suspected Richardson to be the deceased person. Smith explained that he encountered Richardson at the Clarkston Albertsons on the night of November 6 and that Richardson then sought a ride home from the store. Smith could not help Richardson because he rode a bicycle. Richardson unsuccessfully asked others to provide a ride.

Based on Jeff Smith's tip, law enforcement procured and reviewed security camera footage from an Albertsons grocery store, a Costco store, a Walmart store, and a McDonald's restaurant and spoke to workers at the business establishments. The businesses surrounded one another. The various security cameras activated on movement

2

and deactivated without movement.  Law enforcement constructed a timeline of Ina

Richardson's last night alive using the footage.

Walmart videotape showed a distinctive car leaving the nearby Quality Inn and

parking in the Walmart parking lot for approximately one-half an hour.  Bisir Muhammad

worked that evening at the Quality Inn.  The older, boxy, maroon American model car

exhibited a discolored front driver's side rim, a chrome strip, and a light on the side

between the front and rear doors.

An Albertsons inside store camera depicted Ina Richardson shopping for one hour

and ten minutes.  Video from the Albertsons outside security camera showed Richardson

leaving the store at 11:06 p.m. and walking southeast through the parking lot toward a

ubiquitous McDonald's restaurant.  The video shows the distinctive car parked in the

southeast end of the parking lot near the McDonald's for a considerable time before

Richardson approached, with no one entering or emerging from the car.  The camera

stopped recording as Richardson walked into the darkness.

The Albertsons video next displays the activation of the headlights of the

distinctive car.  Seven minutes later the car traveled west through the parking lot.  Video

from a nearby Costco surveillance camera then showed the same vehicle moving with

two people inside.  The car drove on to an access road behind the Quality Inn and parked

in a service entrance area behind the hotel.  Law enforcement later found a condom

wrapper in this secluded location.  At 12:37 a.m., video showed the car leaving the

vicinity. Richardson was never again seen alive.

An autopsy confirmed that someone sexually assaulted and strangled Ina Richardson. The autopsy also verified injuries to Richardson's scalp, face, lips, arms, forearms, hands, thighs, knees, legs, right buttock, and left groin region. Finally, the autopsy showed a large laceration in Richardson's vaginal canal that evidenced a blunt object being forced into the vagina and tearing tissue inside.

Swabs of Richardson's vagina later yielded a small amount of deoxyribonucleic acid (DNA) consistent with Bisir Muhammad's DNA profile. Forensic scientist Anna Wilson testified at trial that use of a condom would explain the limited amount of DNA to test. DNA retrieved from under Richardson's fingernails also matched Muhammad's DNA.

Because video last pictured Ina Richardson walking toward the distinctive maroon car that soon left the parking lot, law enforcement studied the features of the video in hopes of locating the motor vehicle. On November 10, three days after the discovery of Richardson's body, Clarkston Police Officer Darrin Boyd espied the car driving on a city street. Officer Boyd read the vehicle's license plate number and stopped the maroon car to identify the driver and registered owner of the car. Both were Bisir Muhammad.

We now turn to the content of police records filed in response to the motion to suppress. During the investigating stop, Officer Darrin Boyd told Bisir Muhammad of a crime that occurred in the Albertsons parking lot on November 6 and of a car matching

4

Muhammad's car being in the lot. Officer Boyd asked Muhammad whether he parked in the parking lot that night, and Muhammad said no. Muhammad commented that, to his recollection, he drove directly home after finishing his work shift at the Quality Inn that night. Muhammad asked Boyd what crime occurred, and Boyd responded by inquiring of Muhammad if he read the paper. Muhammad answered no. Muhammad asked Boyd if someone robbed McDonalds, and Boyd again answered in the negative. To our knowledge, Boyd did not disclose the nature of the crime. Boyd gained Muhammad's phone number from Muhammad. Officer Boyd thanked Muhammad for his time, apologized for any inconvenience, and released him.

After questioning Bisir Muhammad, Officer Darin Boyd informed others at the Clarkston Police Department that he located the distinctive car depicted in the video footage. Sergeant Richard Muszynski reviewed records and learned that Muhammad was a registered sex offender. Muszynski also noted a prior rape conviction from Arkansas for Muhammad under the alias "Billy Joe Dallas." Clerk's Papers at 414, 475.

Still on November 10, Sergeant Richard Muszynski directed Officer Darrin Boyd to surveil Bisir Muhammad and Muhammad's vehicle. Officer Boyd viewed Muhammad retrieve a woman from his apartment residence, drive to Walmart, enter the store, and return to his home. Muhammad parked the maroon car at the rear of the apartment. For some unknown reason, Boyd abandoned his surveillance. When Boyd returned to the Muhammad apartment building, Boyd noticed the car missing.

Still on November 10, while Officer Darrin Boyd tailed Muhammad, Sergeant Richard Muszynski procured a warrant to search the maroon car. Police could not thereafter locate the car.

Officer Darrin Boyd grew concerned that Bisir Muhammad might flee, destroy evidence, or endanger someone else's safety. Officer Boyd asked police dispatch to request AT&T, Muhammad's cell phone carrier, to "ping" Muhammad's phone. The onomatopoeic term "ping" references the sending of a signal to identify the current location of a cell phone. The phone carrier can discern the location through cell-site locations, truncated as cell-site location (CSL) or cell-site location information (CSLI), or by tracking satellite-based global positioning system data (GPS). The carrier detects a general, not specified, area of the phone by CSL when the cell phone connects with a cell tower in order to initiate or receive a call. GPS data reveals the exact location of the phone by revealing the phone's latitude and longitude coordinates regardless of a pending call.

We now return to more trial testimony. On November 10, Bisir Muhammad's cell phone carrier used a CSL ping and discovered Muhammad's presence in the vicinity of several Lewiston, Idaho, orchards. Lewiston police officers accompanied Clarkston officers in searching the region and locating Muhammad and his car. At the orchards, Sergeant Richard Muszynski advised Muhammad that he held a search warrant for the maroon car and asked if Muhammad would speak to officers at the Clarkston police

6

station.  Muhammad agreed, and officers seized his car pursuant to the warrant.  While in the orchards, officers also seized Muhammad's cell phone without a warrant.  After traveling to Clarkston, officers advised Muhammad of his constitutional rights.  Muhammad signed a form that waived his rights and consented to speak with the officers.

During the beginning of the Clarkston Police Department interview, Bisir Muhammad claimed again that he drove directly home after his shift washing dishes at the Quality Inn on November 6.  Muhammad also stated he would have been home by 10:25 p.m.  Of course, law enforcement had already viewed videos that contradicted Muhammad's statement.  When confronted that a video showed him parked in the Walmart parking lot, Muhammad first responded that he did not remember going to Walmart and had no reason to shop there.  Muhammad next declared that he entered Walmart to cash a paycheck, but the store refused to cash the check.  Officers then disclosed that the Walmart security video depicted Muhammad sitting in his car in the parking lot for thirty minutes and never emerging from the car.  Muhammad again changed his story and asserted that he saw his friend Mike Delameter at a nearby Motel 6.  When officers told Muhammad that a video pictured Ina Richardson walking toward his car that night, he stated he visited with Delameter in the motel at that time.  Officers later approached Delameter, who denied seeing Muhammad that night.

During the November 10 interview at the Clarkston Police Department station, Bisir Muhammad also told officers that he worked at the Clarkston Albertsons for two

months, ending two weeks before November 6, 2014. The officers showed Muhammad a picture of Ina Richardson and asked if he knew her from her shopping at Albertsons. Muhammad recognized Richardson but maintained that he only spoke to her once in a large group setting. Nevertheless, Albertsons security camera footage from inside the store showed Muhammad and Richardson talking alone together on two occasions. In one of the videos, taken one week before her rape and murder, Richardson appears to rebuff an attempted kiss from Muhammad.

During the November 10 interview, Bisir Muhammad repeatedly denied participation in Ina Richardson's disappearance and death and refused to donate a DNA sample. Muhammad finally exercised his right to counsel and left the interview.

On searching Bisir Muhammad's maroon car, officers found, in the trunk, latex gloves, personal lubricant, pornographic digital video disks, and a box of condoms bearing the same lot number as the condom wrapper found in the secluded area where Muhammad had parked for an hour after leaving the Albertsons parking lot. Albertsons clerk Vickie Hollahan testified at trial that Muhammad informed her that he and his wife, who is disabled, do not have sex. Law enforcement tested blood stains on the front passenger seat and headrest and confirmed the fluid as Ina Richardson's blood.

Officers also garnered a warrant to search Bisir Muhammad's cell phone and to gather Muhammad's phone records from AT&T. The phone records undermine Muhammad's claim that he arrived home on November 6 by 10:25 p.m. The records

8

confirm phone calls between Muhammad and his wife beginning at 12:17 a.m. on November 7, 2014, an hour after his car left the Albertsons parking lot. AT&T CSL data confirmed that Muhammad's phone remained stationary during the time his car was parked behind the Quality Inn. After 12:30 a.m., his phone used other cell phone towers, indicating Muhammad traveled. At one time, Muhammad's phone used a cell tower with an unobstructed line of sight to the location where the walkers found Ina Richardson's body.

Police arrested Bisir Muhammad on November 13, 2014. The local newspaper reported the arrest on the front page of the November 13 edition. At 4:50 a.m., on November 14, Muhammad's wife, Detra, called her insurance agent Vicki DeRoche. Detra hysterically wept and told DeRoche that she worried Muhammad had acted awfully. Detra explained that Muhammad came home late on the night of the murder without explanation, that blood spotted his clothes, and that he discarded a used condom while claiming the condom was a latex glove he used to help an injured coworker.

PROCEDURE

The State of Washington charged Bisir Muhammad with murder in the first degree and rape in the first degree. The State pled first degree murder under the felony murder provisions of RCW 9A.32.030(1)(c) based on Muhammad committing the homicide in the furtherance of the rape.

Bisir Muhammad moved to suppress all physical evidence obtained during the law

9

enforcement investigation of his case and identification and location information derived from the warrantless ping. Muhammad also sought suppression of his prearrest statements, including statements made to Officer Darrin Boyd during the car stop. Muhammad argued that Officer Boyd conducted an unlawful stop and that law enforcement improperly gained all search warrants based on information gathered during that stop. Muhammad also argued that officers lacked authority to seize his car in Idaho based on a Washington warrant and that the cell phone ping used to locate Muhammad qualified as an unlawful search. The trial court found that, even if the ping constituted a search, exigent circumstances justified immediate police action to direct the ping. The trial court denied the suppression motion. The court issued an order denying suppression, but entered no formal findings of fact.

After a trial, the jury found Bisir Muhammad guilty of both charges. The jury also found the facts sufficient to support the presence of aggravating circumstances, because of Ina Richardson's vulnerability. The trial court imposed a term of 548 months' confinement for the murder and an indeterminate sentence of 318 months' confinement to life for the rape. Due to the jury's finding of aggravating circumstances, the court ordered, as an exceptional sentence, that the two sentences be served consecutively instead of concurrently. The total term amounts to at least 866 months. The trial court entered findings and conclusions in support of the exceptional sentence that the rape and murder do not merge because the two crimes had independent purposes and effects.

LAW AND ANALYSIS

Vehicle Stop

Bisir Muhammad first contends that Officer Darrin Boyd's stop of his maroon car on November 10, 2014 violated the Fourth Amendment. Muhammad insists that officers saw no criminal conduct in the security videos footage, and thus Boyd lacked grounds to stop his car. By stopping the car, Boyd discovered the identity of Muhammad and his ownership of the distinctive car, which information officers employed that day to procure the search warrant for his car. Because of the illegality of the stop, Muhammad asks that we reverse the trial court's refusal to suppress all physical evidence and statements procured during his questioning. According to Muhammad, all evidence gathered resulted from the illegal stop.

Officer Darrin Boyd detained Bisir Muhammad's car for questioning of the driver rather than to arrest the driver. Thus, we characterize the stop as a *Terry* stop and address the propriety of a *Terry* stop under the circumstances known to Boyd.

We review the traffic stop of the distinctive maroon car only under Washington law, since state law affords an accused greater protection. As a general rule, warrantless searches and seizures are per se unreasonable, in violation of article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Washington recognizes at least six narrow exceptions to the warrant requirement: consent, exigent circumstances, searches incident to a valid arrest, inventory

searches, plain view searches, and *Terry* investigative stops. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).

Whether pretextual or not, a traffic stop constitutes a "seizure" for the purpose of constitutional analysis. *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999). Warrantless traffic stops pass constitutional challenge under article I, section 7 as investigative stops, but only if based on a reasonable articulable suspicion of either criminal activity or a traffic infraction, and only if reasonably limited in scope. *State v. Chacon Arreola*, 176 Wn.2d 284, 292-93, 290 P.3d 983 (2012); *State v. Ladson*, 138 Wn.2d at 350. Likewise, police may conduct a *Terry* stop if police have a reasonable suspicion of criminal activity. *State v. Ibrahim*, 164 Wn. App. 503, 508, 269 P.3d 292 (2011). *Terry* permits an officer to briefly detain, for limited questioning, a person whom he or she reasonably suspects of criminal activity. *State v. Broadnax*, 98 Wn.2d 289, 293-94, 654 P.2d 96 (1982), *abrogated on other grounds by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993).

When police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct.

675, 83 L. Ed. 2d 604 (1985).  The minimally intrusive *Terry* stop, therefore, allows an officer to make an intermediate response to a situation for which he or she lacks probable cause to arrest but which calls for further investigation.  *State v. Kennedy*, 107 Wn.2d 1, 17, 726 P.2d 445 (1986).

Officer Darrin Boyd did not observe any criminal conduct either on the security videos or while observing Bisir Muhammad and before stopping Muhammad.  Nevertheless, the totality of the circumstances gave rise to reasonable suspicion for Officer Boyd to initiate an investigatory stop based on past criminal conduct occurring off camera and known to Boyd.  After studying video footage from the night of Ina Richardson's disappearance, Officer Boyd noted distinctive features of a vehicle toward which Richardson fatefully walked.  Three days later, Boyd witnessed the same distinctive car driving in town.  Based on the idiosyncratic character of the maroon car, Officer Boyd possessed grounds to suspect its driver might hold knowledge concerning the crimes or might have participated in the horrendous crimes against Ina Richardson.

Officer Darrin Boyd's stop did not exceed the scope of a *Terry* search.  Boyd gained identification of Muhammad, asked him if he was present at the crime scene nights earlier, asked him if he saw any suspicious activity that night, and allowed Muhammad to proceed after answering the questions.

Bisir Muhammad contends the stop violated the state constitution because Officer Darrin Boyd articulated no particularized facts supporting the possibility that Muhammad

13

engaged in a crime at the time of the stop. But, similar to federal law, Washington law

does not limit *Terry* stops to crimes in progress. *State v. Snapp*, 174 Wn.2d 177, 198,

275 P.3d 289 (2012). Washington courts have long described the suspicion required to

justify a *Terry* stop as "a substantial possibility that criminal conduct *has occurred* or is

about to occur." *State v. Snapp*, 174 Wn.2d at 198 (emphasis added) (quoting *State v.*

*Johnson*, 128 Wn.2d 431, 454, 909 P.2d 293 (1996)).

Bisir Muhammad cites to *State v. Quezadas-Gomez*, 165 Wn. App. 593, 267 P.3d

1036 (2011) to support his assignment of error. Muhammad uses the decision's analysis

to conclude that, unless probable cause to arrest exists prior to the investigatory vehicle

stop, the stop is unlawful. In *Quezadas-Gomez*, a law enforcement officer stopped the

car driven by Eduardo Quezadas-Gomez based on probable cause that Quezadas-Gomez

engaged in a drug transaction. This court held the stop to be legal because of the

probable cause. The decision did not address the lawfulness of a *Terry* stop.

We observe that other decisions involve the law enforcement officer gaining

reasonable suspicion that a person who previously engaged in, presently engages in, or is

about to engage in a crime. Officer Darrin Boyd held reasonable suspicion that the car

driven by Bisir Muhammad assisted in or functioned as the scene of a crime. On

November 10, Boyd could not identify the driver of the maroon car as the driver of the

car on the night of November 6. In this appeal, Muhammad does not argue the lack of

reasonable suspicion because the videotape did not capture his face or because Officer

14

Boyd did not recognize Muhammad's face while the latter drove his car. We note that the government may temporarily seize property based on a reasonable and articulable suspicion of criminal activity and the object's connection to the activity. *United States v. Van Leeuwen*, 397 U.S. 249, 90 S. Ct. 1029, 25 L. Ed. 2d 282 (1970); *State v. Jackson*, 82 Wn. App. 594, 605-06, 918 P.2d 945 (1996).

The State also contends that, even without information gained by Officer Darrin Boyd during the traffic stop, law enforcement held probable cause to procure the search warrant for the maroon car. We need not address this contention.

Cell Phone Ping

Bisir Muhammad next contends the Clarkston Police Department violated his constitutional right to privacy when gathering from the phone carrier information as to the current location of Muhammad's cell phone. Thus, Muhammad seeks suppression of all evidence and information gathered after the warrantless, surreptitious ping. We decline to decide the important question of whether a warrantless employment of a cell phone ping infringes on the phone owner's privacy rights under article I, section 7 of the Washington State Constitution. We instead affirm the trial court's ruling that exigent circumstances warranted the ping.

Exigent circumstances exist to excuse the warrant requirement if demand for immediate investigatory action renders it impracticable for the police to obtain a warrant. *State v. Cardenas*, 146 Wn.2d 400, 405, 47 P.3d 127, 57 P.3d 1156 (2002). Exigent

15

circumstances excuse the requirement to obtain a warrant prior to conducting a search when obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape, or permit the destruction of evidence. *State v. Smith*, 165 Wn.2d 511, 517, 199 P.3d 386 (2009). Five circumstances qualify as exigent circumstances: (1) a hot pursuit, (2) a fleeing suspect, (3) danger to the arresting officer or to the public, (4) the mobility of a vehicle, and (5) the mobility or destruction of evidence. *State v. Counts*, 99 Wn.2d 54, 60, 659 P.2d 1087 (1983). To determine whether exigent circumstances exist, a court must look to the totality of the circumstances. *State v. Smith*, 165 Wn.2d at 518.

Six nonexclusive factors guide the analysis of whether exigent circumstances exist under the law of search and seizure: (1) the gravity or violent nature of the offense with which the suspect is to be charged, (2) whether the suspect is reasonably believed to be armed, (3) whether there is reasonably trustworthy information that the suspect is guilty, (4) there is strong reason to believe that the suspect is on the premises, (5) a likelihood that the suspect will escape if not swiftly apprehended, and (6) the entry is made peaceably. *State v. Cardenas*, 146 Wn.2d at 406 (2002). While every factor need not be present to establish exigency, in the aggregate the factors must establish the need to act quickly. *State v. Patterson*, 112 Wn.2d 731, 736, 774 P.2d 10 (1989). The mere suspicion of flight or destruction of evidence does not satisfy a "particularity" requirement of exigent circumstances. *State v. Coyle*, 95 Wn.2d 1, 9, 621 P.2d 1256

16

(1980).

All but one of the six exigent circumstances factors militate in favor of a finding of exigent circumstances in this appeal. Although officers knew Ina Richardson experienced a violent death, officers did not know Bisir Muhammad to bear arms. Nevertheless, the nature of the crime rises to the zenith in terms of an individual victim. Bisir Muhammad's driving of and ownership of the distinctive car found in the video, his employment near the site of the crime, and his previous encounters with Ina Richardson that could have led Richardson to trust him engendered a reasonable belief of his being a suspect. Muhammad already knew that law enforcement knew of his car's proximity to the crime and Muhammad would suspect that law enforcement considered him a suspect. Therefore, a wise Muhammad would have fled the region, but surprisingly failed to do so. Perhaps he thought he could hide from law enforcement in an orchard located in another state. Law enforcement peacefully entered the orchard where Muhammad reposed. Although such evidence could likely not be introduced at trial, officers also knew Muhammad to be a registered sex offender with a previous rape conviction under another name. Use of the ping would reasonably identify the location of Muhammad.

Bisir Muhammad promotes the lack of exigent circumstances due to the fact that Ina Richardson's murder occurred three days earlier. He also emphasizes that Officer Darrin Boyd made no mention of a homicide when stopping Muhammad earlier that day. Muhammad underscores that he had not fled by the time Boyd stopped him. Finally,

Muhammad highlights the fact that Boyd abandoned his surveillance of Muhammad at the latter's apartment. Nevertheless, none of the exigent circumstances factors depend on whether an officer earlier disclosed the nature of a crime to the suspect. While the crime occurred three days before officers pinged Muhammad's phone, the ping, as the trial court noted, occurred only hours after Boyd encountered Muhammad and commented that police knew of the crime and knew of the presence of the maroon car in the location of the crime. Muhammad had not earlier fled, but he lacked knowledge that officers knew of the connection of the maroon car to the crime. Officers could reasonably deduce that the window of time for collection of evidence rapidly closed. Like Muhammad, we question Boyd's abandonment of the surveillance, but the abandonment could be the result of another emergency or simple neglect. Neglectful conduct does not dissipate exigent circumstances.

We question, as does Bisir Muhammad, the validity of the exigent circumstances exception to the warrant requirement now that law enforcement may promptly gain a search warrant through telephone calls to a judge at nearly any time of day. Nevertheless, any abrogation or restriction of the exigent circumstances doctrine should come from our state Supreme Court. We also cannot preclude the possibility that some circumstances, such as immediate unavailability of a magistrate, prevented law enforcement from quickly gaining a search warrant for the ping on November 10.

Double Jeopardy

Bisir Muhammad assigns error for the first time on appeal to his convictions for both first degree murder and first degree rape. By emphasizing that the State employed the rape to qualify him for a first degree murder conviction, Muhammad contends the two convictions violate double jeopardy principles.

Whether the two convictions violate double jeopardy principles poses as the most difficult question in this appeal. Both parties raise excellent arguments in advance of each's respective position. Because of a common practice of charging an offender for more than one crime based on one act or one course of conduct, the jurisprudence of double jeopardy spawns numerous federal and state decisions. In turn, courts have split double jeopardy principles into multipart tests, rules, and subrules that emphasize different features of a prosecution or the multiple acts of the accused. For these reasons, many decisions support the State's arguments and numerous decisions corroborate Bisir Muhammad's contrary arguments, such that this court would stand on firm foundation in ruling in favor of either party. We conclude, however, that convictions for first degree rape and first degree murder, under this appeal's circumstances, do not offend double jeopardy because the murder did not necessarily follow from the rape and the murder statutes and rape statutes serve diverse purposes.

Under the United States Constitution, no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Under our

state constitution: "No person shall be . . . twice put in jeopardy for the same offense."

WASH. CONST. art. 1, § 9. These clauses protect defendants against "prosecution

oppression." *State v. Womac*, 160 Wn.2d 643, 650, 160 P.3d 40 (2007).

The double jeopardy clause of the Fifth Amendment encompasses three separate

constitutional protections: against a second prosecution for the same offense after

acquittal, against a second prosecution for the same offense after conviction, and against

multiple punishments for the same offense. *State v. Gocken*, 127 Wn.2d 95, 100, 896

P.2d 1267 (1995). The federal and state double jeopardy provisions parallel one another

in thought, substance, and purpose and thus afford the same protections. *In re Personal*

*Restraint of Davis*, 142 Wn.2d 165, 171, 12 P.3d 603 (2000).

An offender may raise a double jeopardy challenge for the first time on appeal.

*State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). The usual remedy for

violations of the prohibition of double jeopardy is to vacate the lesser offense. *State v.*

*Hughes*, 166 Wn.2d 675, 686 n.13, 212 P.3d 558 (2009).

Despite the double jeopardy clause, the State may bring multiple charges arising

from the same criminal conduct in the same proceeding. *State v. Michielli*, 132 Wn.2d

229, 238-39, 937 P.2d 587 (1997). Because the legislature holds the power to define

offenses, whether two offenses are separate offenses hinges on whether the legislature

intended them to be separate. *In re Personal Restraint of Francis*, 170 Wn.2d 517, 523,

242 P.3d 866 (2010). Within constitutional constraints, the legislature may define crimes

and punishments as it sees fit. *State v. Smith*, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013); *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995).

In the context of an accused, such as Bisir Muhammad, charged with crimes under two statutes, courts base any double jeopardy review on statutory analysis, not constitutional law. One might question if a prosecution under two distinct statutes even raises double jeopardy concerns, because courts defer to intent of the legislature. The legislature, without constitutional restrictions, may punish the same act twice by creating distinct crimes.

A trial court's imposition of more than one punishment for a criminal act that violates more than one criminal statute does not necessarily constitute multiple punishments for a single offense for purposes of double jeopardy. *State v. Calle*, 125 Wn.2d at 780 (1995). In order to determine if multiple convictions violate double jeopardy, we ask whether the legislature intended to allow multiple punishments for criminal conduct that violates more than one statute. *State v. Louis*, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). If the legislature intended that cumulative punishments can be imposed for the crimes, double jeopardy is not offended. *In re Personal Restraint of Borrero*, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007). Also, if the legislature does not value a court's decision prohibiting an accused from convictions on two crimes for the same act or similar acts, the legislature could avoid the repercussions of the ruling by increasing the punishment of one of the crimes. For this reason, the double jeopardy

clause constrains more the prosecution and the courts, rather than the legislature.

The analysis throughout a double jeopardy review focuses on the intent of the legislature, but we start with determining whether the language of the criminal statutes shows a desire to allow prosecution for the separate crimes. To determine whether the legislature intended two separate offenses, we first consider any express or implicit representations of legislative intent. *In re Personal Restraint of Francis*, 170 Wn.2d at 523 (2010). We seek to determine if the legislature defined what it considered to be one unit of prosecution. The unit of prosecution is the essential conduct that makes up the core of the offense. *In re Personal Restraint of Francis*, 170 Wn.2d at 528 (2010).

We quote the relevant sections of the first degree murder and first degree rape statutes, the crimes of Bisir Muhammad's convictions. RCW 9A.32.030 defines murder in the first degree as:

> (1) A person is guilty of murder in the first degree when:
> (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; or
> . . . .
> (c) He or she commits or attempts to commit the crime of either (1) robbery in the first or second degree, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first or second degree, or (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants. . . .

RCW 9A.32.030(1)(c), one of two felony murder statutes, allows the State to convict a defendant of first degree murder without showing premeditated intent if the defendant

also commits one of five crimes, including rape. *State v. Craig*, 82 Wn.2d 777, 781-82,

514 P.2d 151 (1973). First degree felony murder requires no specific criminal mental

state other than the one necessary for the predicate crime. *State v. Frazier*, 99 Wn.2d

180, 192, 661 P.2d 126 (1983). RCW 9A.32.050(1)(b) contains another felony murder

provision when a defendant commits a felony, other than the five listed in RCW

9A.32.030(1)(c), during the course of the murder, but this statute classifies the crime as

second degree murder. Under the former statute, RCW 9A.32.030(1)(c), the State need

not prove a consummated rape, only an attempt to rape, to convict for first degree felony

murder.

RCW 9A.44.040 defines first degree rape as:

(1) A person is guilty of rape in the first degree when such person
engages in sexual intercourse with another person by forcible compulsion
where the perpetrator or an accessory:
(a) Uses or threatens to use a deadly weapon or what appears to be a
deadly weapon; or
(b) Kidnaps the victim; or
(c) Inflicts serious physical injury, including but not limited to
physical injury which renders the victim unconscious. . . .

One might conclude that the legislature wanted Bisir Muhammad convicted of two

crimes, since it created two distinct crimes, but such a conclusion would mean double

jeopardy could never bar charges under two statutes. One might also conclude that the

legislature only wanted Muhammad convicted of one crime since the first degree murder

statute incorporates the first degree rape statute. But we also observe that the State may

convict a defendant of first degree felony murder without convicting the defendant of rape by convicting him of one of five other felonies. In the end, we discern no clear evidence, in the statutory language, of the Washington State Legislature's intent as to whether the State may convict one or both first degree rape and first degree murder for one course of conduct.

When, as here, the language of the statutes lies silent on this question, we next apply the *Blockburger* "'same evidence'" rule of statutory construction. *State v. Freeman*, 153 Wn.2d 765, 776, 108 P.3d 753 (2005). Since this principle constitutes a rule of statutory construction, we again defer to legislative intent rather than enforcing constitutional principles.

Under the United States Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932), when "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one is whether each provision requires proof of a fact which the other does not." Unless each crime contains an element not found in the other crime, double jeopardy precludes a conviction on both crimes. Although courts purportedly apply the *Blockburger* test when they cannot discern legislative intent, the test serves as just another means of discerning legislative intent. *State v. Calle*, 125 Wn.2d at 780 (1995).

Washington modifies the *Blockburger* test to read: "double jeopardy principles are

24

violated if the defendant is convicted of offenses that are identical in fact and in law." *In re Personal Restraint of Borrero*, 161 Wn.2d at 537 (2007). Going further,

> If the language of the criminal statutes under which the defendant has been punished does not expressly disclose legislative intent with respect to multiple punishments, the court then considers principles of statutory construction to determine whether multiple punishments are authorized. . . . If each offense contains an element not contained in the other, the offenses are not the same; if each offense requires proof of a fact that the other does not, the court presumes the offenses are not the same.

*In re Personal Restraint of Borrero*, 161 Wn.2d at 536-37. Under this test, the facts of the case gain the same prominence as the legal definitions of the respective crimes.

Under the law half of the same evidence test, a double jeopardy violation occurs when the evidence required to support a conviction on one charge would suffice to warrant a conviction on the other. *State v. Freeman*, 153 Wn.2d at 772 (2005). But, when each offense requires proof of an element not required in the other and when proof of one offense does not necessarily prove the other, the offenses are not the same and multiple convictions are permitted. *State v. Louis*, 155 Wn.2d at 569 (2005).

In Bisir Muhammad's prosecution, the first degree murder charge incorporated the first degree rape charge. The State needed to prove all elements of first degree rape in order to convict on first degree murder. Therefore, convicting Muhammad of first degree rape did not require proof of an element not needed to convict of first degree murder. If our analysis ended here, the two convictions breached double jeopardy restrictions. In fact one of the decisions cited by Bisir Muhammad, *State v. Jackman*, 156 Wn.2d 736

25

(2006), ends the double jeopardy analysis with the *Blockburger* test. Nevertheless, other Washington Supreme Court decisions instruct us to continue with the analysis. We review those decisions shortly.

The State argues that the proof between first degree felony murder and first degree rape differs because an accused may commit felony murder by attempted rape. The State need not establish a completed rape.

We agree with the State that, when one of the two crimes is an attempt crime, the double jeopardy test requires further refinement. *In re Personal Restraint of Borrero*, 161 Wn.2d at 537 (2007). This refinement results from the criminal attempt statute containing the element that the person performs an act that constitutes "a substantial step toward the commission of that crime." RCW 9A.28.020(1). Only by examining the actual facts constituting the "'substantial step'" can the determination be made that the defendant's double jeopardy rights have been violated. *In re Personal Restraint of Borrero*, 161 Wn.2d at 537.

We discern no need to distinguish between a felony murder statute that permits a conviction based on an attempted predicate crime, as opposed to a completed predicate crime, for double jeopardy purposes in this appeal. We consider any such distinction irrelevant when the State charges the defendant with a completed felony. The State charged and convicted Bisir Muhammad with a consummated rape. We find no decision that performs a refined analysis of the *Blockburger* test when felony murder could be

26

committed by an inchoate crime, but the accused committed a completed crime. The

State's argument would require the refined scrutiny in every case involving Washington's

first degree felony murder statute.

Washington's version of the *Blockburger* test does not end a court's analysis. The

mere fact that the State employs the same conduct to prove each crime is not dispositive.

*State v. Freeman*, 153 Wn.2d at 777 (2005). Although the *Blockburger* test or same

evidence test probe indicators of legislative intent, the test does not always dispose of the

question of whether two offenses are the same. *State v. Calle*, 125 Wn.2d at 780 (1995).

Washington courts rely on additional indicia of legislative intent. *State v. Calle*, 125

Wn.2d at 780. In addition, the Washington Legislature holds the power to criminalize

every step leading to the greater crime and the crime itself. *Whalen v. United States*, 445

U.S. 684, 688-89, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); *State v. Freeman*, 153

Wn.2d at 771 (2005). So we continue with our statutory construction, not the application

of constitutional tenets.

In the last of many steps behind double jeopardy scrutiny, we still examine the

respective criminal statutes' language and their history to resolve whether the legislature

intended to punish for separate crimes, even though committed by a single act. *State v.*

*Calle*, 125 Wn.2d at 780. The differing purposes served by the respective statutes and

their location in different chapters of the criminal code comprise evidence in part of the

legislature's intent to punish the two acts as separate offenses. *State v. Calle*, 125 Wn.2d

at 780.  At this stage of the double jeopardy review, we may return to other evidence of legislative intent, including the statutes' historical development, legislative history, location in the criminal code, or the differing purposes for which they were enacted. *State v. Freeman*, 153 Wn.2d at 777 (2005).  We may discern legislative intent from the legislative history, the structure of the statutes, the fact the two statutes seek to eliminate different evils, or any other source of legislative intent.  *Ball v. United States*, 470 U.S. 856, 862-64, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985); *State v. Calle*, 125 Wn.2d at 777-78.  If each criminal statute serves an independent purpose or effect, the State may punish violations of the two statutes as separate offenses.  *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979).  The process is recursive, returning to the legislature's intent again and again.  *State v. Freeman*, 153 Wn.2d at 777.  In *State v. Calle*, the Washington State Supreme Court upheld convictions of rape and incest on the rationales that the two crimes lay in distinct chapters within the criminal code and each crime served to protect different societal interests, despite the same act forming the basis for each crime.

The statutes prohibiting murder and rape serve discrete goals.  Chapter 9A.36 RCW, the code chapter creating homicide crimes, serves the public policy favoring the protection of human life.  *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 944, 913 P.2d 377 (1996).  One of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder.  *Gregg v. Georgia*, 428 U.S. 153, 226, 96 S. Ct. 2909, 49 L. Ed. 2d

859 (1976) (White, J., concurring).

Chapter 9A.44 RCW, the chapter creating sex crimes, primarily seeks to prohibit acts of unlawful sexual intercourse, with punishment dependent on the accompanying circumstances. *State v. Calle*, 125 Wn.2d at 781 (1995). The focus of the crime is not simply sexual violation, but also the fear, degradation and physical injury accompanying that act. Helen Glenn Tutt, Comment, *Washington's Attempt To View Sexual Assault as More Than a "Violation" of the Moral Woman-The Revision of the Rape Laws*, 11 GONZ. L. REV. 145, 155 (1975). Thus, the two criminal statutes violated by Bisir Muhammad serve distinct purposes that command two convictions.

We observe that Bisir Muhammad's rape of Ina Clare Richardson raised his crime from second degree murder to first degree murder. Thus, the rape formed an essential element of the murder charge. In *State v. Freeman*, 153 Wn.2d 765 (2005), the state high court noted that convictions for the crimes of first degree robbery and second degree assault generally could not stand because the assault raised the robbery from second degree to first degree. Nevertheless, under the facts of the appeal, the Supreme Court declined to strike the predicate crime because the victim of the crime suffered injuries from the assault distinct from any injury suffered by the robbery. Ina Clare Richardson suffered injuries from the rape distinct from the mortal harm incurring from the murder.

Bisir Muhammad maintains that *Harris v. Oklahoma*, 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed. 2d 1054 (1977) supports his position that felony murder cannot be

29

punished in conjunction with the predicate felony that forms the basis of the murder charge. We disagree. In *Harris*, the United States Supreme Court held the Fifth Amendment prohibited a separate trial and conviction for robbery, a predicate of felony murder, after the State convicted the accused of the murder. *Harris* does not address, let alone prohibit, trying and convicting a defendant of both felony murder and the predicate felony during the same trial. The *Harris* Court relied on the rule of law that, when conviction of a greater crime cannot be had without conviction of the lesser crime, double jeopardy bars prosecution for the lesser crime after conviction of the greater one. The State charged Bisir Muhammad with the predicate crime in the same prosecution as the felony murder.

A United States Supreme Court decision with closer facts is *Whalen v. United States*, 445 U.S. 684 (1980). The District of Columbia convicted Thomas Whalen of rape and killing the same victim during the perpetration of the rape. Rape was one of six predicate crimes that raised the murder to first degree murder. The United States Congress adopted the criminal code for the district, such that the United States Supreme Court sat more as the highest level of a state court system than as the Supreme Court of a nation. The District of Columbia Court of Appeals rejected Whalen's argument that the rape conviction merged, based on the double jeopardy clause, with the first degree murder conviction. The Supreme Court disagreed based on a District of Columbia statute enacted by Congress that precluded multiple punishments for two offenses arising out of

the same criminal transaction unless each offense required proof of a fact that the other

did not. The Supreme Court reasoned that the statute ended the double jeopardy analysis

with the *Blockburger* test, such that the Court refused to analyze further the legislative

intent of Congress. The Court vacated the rape conviction since a conviction for killing

in the course of the rape could not be had without proving all the elements of the offense

of rape. We decline to follow *Whalen* since Washington has no similar statute.

## Merger

When the accused challenges two convictions on double jeopardy grounds, the

accused typically also challenges the convictions on the related doctrine of merger. Bisir

Muhammad follows this practice.

Courts sometimes merge the merger doctrine with double jeopardy. Some courts

often write that, because of double jeopardy constraints, the two crimes "merge." *State v.*

*Johnson*, 92 Wn.2d at 681 (1979). Nevertheless, the law considers the two doctrines

distinct despite both relying on legislative intent.

The merger doctrine serves as another tool of statutory construction designed to

prevent the pyramiding of charges on a criminal defendant. *State v. Saunders*, 120 Wn.

App. 800, 820, 86 P.3d 232 (2004). Similar to the double jeopardy analysis, courts

employ the doctrine to resolve whether the legislature intends multiple punishments to

apply to particular offenses. *State v. Saunders*, 120 Wn. App. at 820. Merger applies

when proof of one crime proscribed in one section of the criminal code elevates a second

31

crime found in another section to a higher degree. *State v. Saunders*, 120 Wn. App. at 820. Generally a predicate offense will merge into the second crime, and the court may not punish the predicate crime separately. *State v. Saunders*, 120 Wn. App. at 821.

An exception to the merger doctrine lies when the predicate and charged crimes do not intertwine. *State v. Saunders*, 120 Wn. App. at 821. Even if two convictions appear to merge on an abstract level, they may be punished separately if the defendant's conduct forming one crime demonstrates an independent purpose or effect from the second crime. *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). The merger doctrine applies when the legislature clearly indicates that it did not intend to impose multiple punishments for a single act that violates several statutory provisions. *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983).

The merger doctrine applies when one crime is incidental to the commission of the second crime. *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299 (2012). To the contrary, if the predicate crime injures the person or property of the victim or others in a separate and distinct manner from the crime for which it serves as an element, the crimes do not merge. *State v. Harris*, 167 Wn. App. at 355.

The merger doctrine applies at the time of sentencing and its purpose is to correct violations of the prohibition of double jeopardy. *State v. Parmelee*, 108 Wn. App. 702, 711, 32 P.3d 1029 (2001). As such, the doctrine aims at providing remedies. *State v. Chesnokov*, 175 Wn. App. 345, 355, 305 P.3d 1103 (2013).

Bisir Muhammad astutely relies on *State v. Fagundes*, 26 Wn. App. 477, 614 P.2d 198 (1980), in which this court merged the predicate felonies of first degree rape and first degree kidnapping into a felony murder conviction. We acknowledged the underlying felony served additional purposes apart from simply elevating the degree of seriousness for the murder charge, but nonetheless merged the convictions since proof of the underlying felony was necessary to prove the felony murder.

Bisir Muhammad also relies on *State v. Williams*, 131 Wn. App. 488, 128 P.3d 98 (2006), where a predicate robbery charge merged with felony murder because the murder occurred in the immediate flight from the robbery and served to help facilitate an escape. Nevertheless, this court clarified that the robbery would not merge if it was "merely incidental" to the homicide.

*State v. Fagundes* and *State v. Williams* support Bisir Muhammad's request for merger. Nevertheless, we follow the teachings of *State v. Vladovic*, 99 Wn.2d at 421 (1983) instead. *Vladovic* followed *Fagundes* by three years. In *Vladovic*, our high court declared: "if the offenses committed in a particular case have independent purposes or effects, they may be punished separately." 99 Wn.2d at 421.

We also find other Washington decisions that support rejection of merger in Bisir Muhammad's appeal. In *State v. Saunders*, 120 Wn. App. 800 (2004), this court held that convictions for felony murder and first degree rape did not merge when the murder was separate and distinct from the rape. Ray Saunders and Leanna Williams restrained

33

Marcia Grissett with handcuffs and leg shackles. Saunders attempted to force Grissett to perform oral sex on him, and Williams anally raped Grissett with a television antenna. Ultimately, Saunders stabbed Grissett in the chest with a knife and either Saunders or Williams strangled Grissett, who died from the stabbing and the simultaneous asphyxia from strangulation. On appeal, similar to Bisir Muhammad, Saunders argued that the two convictions should merge.

To determine whether Ray Saunders' two convictions sufficiently intertwined for merger to apply, this court considered whether the crimes occurred almost contemporaneously in time and place, whether the sole purpose of one crime facilitated the other, and whether the victim suffered any injury independent of or greater than the injury associated with the predicate crime. Even though the acts occurred at the same time and place, the court did not merge the two convictions. The court reasoned that Marcia Grissett sustained injuries independent of and exceeding that necessary to commit the murder and found the rape did not facilitate the murder.

In *State v. Peyton*, 29 Wn. App. 701, 630 P.2d 1362 (1981), William Peyton and his associates robbed a bank. After fleeing the bank in one vehicle, the robbers drove the vehicle to a nearby location, abandoned the vehicle, and entered and continued the flight in a second vehicle. The group eventually abandoned the second vehicle and ran across fields, where they engaged in a shooting match with pursuing officers. A bullet fired by Peyton killed one officer. The court held that the underlying robbery that served as the

predicate crime for first degree murder did not merge in the murder conviction because the two crimes did not intertwine.

Bisir Muhammad's rape of Ina Clare Richardson was not integral to her killing. Although Richardson's murder silenced her from reporting the rape, the murder did not effectuate or coincide with the rape. Following the reasoning of *Vladovic, Peyton,* and *Saunders,* the two crimes had independent purposes and effects. Ina Richardson suffered many injuries from her rape including a laceration in her vaginal canal that caused bleeding, and injuries to her thighs, knees, legs, right buttock and left groin region. These injuries differed from the injuries to her neck and eyes that resulted from being strangled to death. As a result, the two crimes may be punished separately. We refuse to merge the first degree murder with the first degree rape conviction.

## CONCLUSIONS

We affirm Bisir Muhammad's convictions for first degree murder and first degree rape. Because the State does not seek an award of appellate costs, we deny an award of costs to the prevailing party.

Fearing, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Siddoway, J.

35